Eugene Frank TAMME, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 94–SC–637–MR.

Supreme Court of Kentucky.

March 19, 1998.

As Modified on Denial of Rehearing Sept. 3, 1998.

15

16

Julie Namkin, Assistant Public Advocate, Rebecca Ballard Diloreto, Assistant Public Advocate, Frankfort, for Appellant.

A.B. Chandler, III, Attorney General, Paul W. Richwalsky, Jr., Assistant Attorney General, Special Prosecutions Division, Ian G. Sonego, Criminal Appellate Division, Office of the Attorney General, Jeffrey Slayton Smith, Office of Attorney General, Frankfort, for Appellee.

COOPER, Justice.

Appellant was convicted in the Fayette Circuit Court of two counts of murder and was sentenced to death on each count. He appeals to this Court as a matter of right. Ky. Const. § 110(2)(b); KRS 532.075. He raises ninety-nine (99) issues on appeal. For convenience, we have organized these issues into twelve categories. Many of Appellant's claims of error are preserved, but most are not. To the extent that an issue is unpreserved, it has been reviewed in accordance with the standard enunciated in *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367, 369 (1989), *cert. denied*, 493 U.S. 1063, 110 S.Ct. 880, 107 L.Ed.2d 963 (1989), *i.e.*, whether there was a reasonable justification or explanation for defense counsel's failure to object, and whether the totality of the circumstances

is persuasive either that the defendant would not have been found guilty of a capital offense or that death would not have been imposed but for the unpreserved error. The offenses were committed prior to the adoption of the Kentucky Rules of Evidence, but the trial was held thereafter. To the extent that the adoption of the Rules affected the admissibility of any evidence, the rule of admissibility more favorable to Appellant has been applied. KRE 107(b).

Harold Southerland and Neal Maddox disappeared on August 11, 1983. On August 26, a part-time deputy sheriff discovered a strange car in the dump at Scott's Ridge and notified the police. Kentucky State Police Detective Don Knifley searched the vehicle and discovered check stubs and a telephone bill belonging to Harold Southerland. Because the telephone bill reflected numerous telephone calls between Southerland's residence and Appellant's residence and place of employment, Knifley interviewed Appellant on September 28, 1983. No arrest was made and further investigation revealed nothing of substance.

On September 24, 1984, William Buchanon, a business partner of Appellant, contacted the Kentucky State Police and told them that he had been present when Appellant murdered Southerland and Maddox and that he assisted Appellant in disposing of their bodies. Although both Buchanon and Appellant were indicted for the murders, their cases were severed for purposes of trial. Appellant went to trial in June 1985, and Buchanon was the chief witness against him. Appellant was convicted of both murders and sentenced to death. In August 1985, the Commonwealth recommended that Buchanon be allowed to plead guilty to criminal facilitation of murder with a five year sentence. The trial judge refused to accept this plea agreement and Buchanon subsequently entered an *Alford* plea, *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to one count of complicity to murder. He was sentenced to twenty years probated for five years and immediately released from custody. On appeal, Appellant's convictions were reversed for a new trial. *Tamme v. Commonwealth,* Ky., 759 S.W.2d 51 (1988).

The second trial was held on June 13–23, 1994.

## I. SPEEDY TRIAL

 Appellant argues that his constitutional right to a speedy trial was violated by the more than five year delay between the reversal of his first conviction and his second trial. The right to a speedy trial is guaranteed by both the Sixth Amendment to the United States Constitution and Section 11 of the Constitution of Kentucky. Four factors are to be considered when determining whether this right has been violated: (1) length of the delay; (2) reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

 Appellant did not file a motion for a speedy trial. Although he did file a pro se motion to dismiss for failure to provide a speedy trial, a motion to dismiss is not a formal demand for a speedy trial. *McDonald v. Commonwealth,* Ky., 569 S.W.2d 134 (1978), *cert. denied,* 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979). After his first convictions were overturned, Appellant moved for bail pending retrial, which was denied. Appellant cites *Cain v. Smith,* 686 F.2d 374 (6th Cir.1982) for the proposition that a motion for release is "the functional equivalent of pressing his right to a speedy trial." In fact, the defendant in *Cain* forcefully asserted his speedy trial rights, but conceded that the strength of his speedy trial objection would be diminished if his bond were reduced. The Court of Appeals for the Sixth Circuit held that this concession did not constitute a waiver of his speedy trial objection. *Id.* at 384. The statement quoted by Appellant originated in *United States v. Calloway,* 505 F.2d 311, 316 (D.C.Cir.1974), in which the defendant made repeated and continued motions for release pending trial. We are unprepared to hold that an isolated motion for bail "unequivocally puts the trial court on notice that the defendant demands a speedy trial." *McDonald v. Commonwealth, supra,* at 137.

The reasons for the delay in this case were not nefarious in nature. The Commonwealth

moved for a new trial date on February 24, 1989. On motion of Appellant, the original trial judge recused himself on April 17, 1989. The special judge appointed to replace him recused himself on August 28, 1989. The second special judge resigned from the case due to health problems on March 15, 1990. In response to a discovery motion by Appellant, the third special judge ordered the Commonwealth to furnish Appellant with Buchanon's present address. The Commonwealth successfully appealed from this order, but the appeal was not decided until October 22, 1992. On January 8, 1993, new defense counsel entered the case. Due to the intervening death of the third special judge, a fourth special judge was appointed on February 4, 1993. On Appellant's motion, venue was changed from Washington County to Fayette County. On August 25, 1993, Appellant's new counsel moved to withdraw, which motion was granted on October 4, 1993. New counsel entered their appearance for Appellant on November 23, 1993. The second trial finally began on June 13, 1994.

■■■ The Commonwealth was not responsible for the recusals, illness and death which befell four judges in this case. Nor is the Commonwealth responsible for the resignations of two teams of defense counsel. Any delay attributable to time consumed by the interlocutory appeal does not count toward Appellant's speedy trial claim. The appeal was neither tangential nor frivolous. The fact that the Commonwealth prevailed on the appeal is prima facie proof of the reasonableness of taking the appeal. *United States v. Loud Hawk*, 474 U.S. 302, 315–16, 106 S.Ct. 648, 656, 88 L.Ed.2d 640 (1986).

We agree that Appellant was prejudiced by the mere fact that he was incarcerated during the interim. *Barker v. Wingo, supra*, 407 U.S. at 532–33, 92 S.Ct. at 2192–93; *Cain v. Smith, supra*, at 384–85. However, he does not identify any prejudice relating to his ability to present evidence at his second trial. Weighing all of the four factors enumerated in *Barker v. Wingo, supra*, we conclude that in this case the delays do not justify "the unsatisfactorily severe remedy of dismissal." *Id.*, 407 U.S. at 522, 92 S.Ct. at 2188.

## II. JUDICIAL RECUSALS

Appellant argues that it was error for the first special judge to recuse himself and error for the fourth special judge, who ultimately tried the case, not to recuse himself. The first special judge recused himself because he did not feel he could impose the death penalty in a case in which an accomplice received a probated sentence. KRS 26A.015(2)(a) and (e), provide as follows:

(2) Any justice or judge of the Court of Justice . . . shall disqualify himself in any proceeding:

(a) Where he has a personal bias or prejudice concerning a party, . . . or has expressed an opinion concerning the merits of the proceeding;

. . .

(e) Where he has knowledge of any other circumstances in which his impartiality might reasonably be questioned.

■■■ The Commonwealth, as well as the defendant, is entitled to a judge who has not prejudged the case. When the first special judge advised that he could not impose the death penalty if recommended by the jury, he appropriately recused himself.

■■■ At a hearing on the motion of Appellant's second counsel to withdraw from the case, information was disclosed regarding "an exchange of money to be given to witnesses" by people "very close" to Appellant. Upon learning of this information, the fourth special judge wondered aloud if he was now "tainted." Appellant did not request a recusal, but now concludes after-the-fact that the trial judge was indeed "tainted" and should have recused himself. Recusal is required only when the judge receives information from an extrajudicial source. *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 112–13 (1994), *cert. denied*, 513 U.S. 1174, 115 S.Ct. 1154, 130 L.Ed.2d 1111 (1994); *see also Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994). The distinction between the recusal of the first special judge and the nonrecusal of the fourth special judge is that the first special judge concluded that he was biased and the fourth special judge concluded that he was

not. We find neither conclusion to have been clearly erroneous.

### III. DISCOVERY ISSUES

*1. Buchanon's plea agreement.*

■ The fact that Buchanon had received a reduced sentence in exchange for his cooperation with the Commonwealth was exculpatory evidence discoverable by Appellant. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *see Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Williams v. Commonwealth,* Ky., 569 S.W.2d 139 (1978). Of course, Appellant already knew about Buchanon's deal, since it was consummated in open court prior to the second trial. Indeed, Buchanon was cross-examined extensively about the agreement. Appellant's complaint is that he was never able to discover exactly what Buchanon gave in consideration for the plea agreement. Appellant never specifically requested this information, even during cross-examination of Buchanon, and we are satisfied that Appellant knew then and knows now that the quid pro quo for Buchanon's plea agreement was his cooperation and testimony against Appellant.

*2. Polygraph charts.*

■ Before the first trial, Buchanon was subjected to polygraph examinations. In 1990, Appellant filed a discovery request for the polygraph examiner's case notes, the questions and responses of the examiner and witness, and the polygraph charts. Appellant was furnished with a copy of Buchanon's interview with the polygraph examiner and with the results of the examination. The trial judge held that Appellant was not entitled to the charts. Appellant acknowledges that none of the polygraph evidence was admissible at trial. *Morgan v. Commonwealth,* Ky., 809 S.W.2d 704 (1991). Thus, even if Appellant could have produced a polygraph examiner who would have interpreted the charts differently than the Commonwealth's examiner, that evidence would have been inadmissible. The inability to obtain these charts could not have prejudiced Appellant's case.

### IV. JURY SELECTION AND MANAGEMENT

*1. Requested admonition.*

■ The trial judge declined Appellant's request that he personally admonish the jury at the beginning of the trial that an indictment is not evidence of a defendant's guilt. As required by RCr 9.56, the jury was so admonished in the written instructions given at the conclusion of the trial. Appellant cites no authority other than a recommendation in the *Kentucky Circuit Judges Benchbook,* § 255(8) and (9). The recommendation has merit, but the failure to follow it is not reversible error. We note that defense counsel was permitted during voir dire to explain the function of an indictment to the jury.

*2. Voir dire.*

■ The trial judge did not conduct individual voir dire regarding pretrial publicity as required by RCr 9.38. The purpose of that provision is to guard against prospective jurors relating their knowledge of the case in open court and thereby tainting other jurors who may not have had any such knowledge. *See Thompson v. Commonwealth,* Ky., 862 S.W.2d 871, 874 (1993). Here, the trial judge inquired during group voir dire whether any prospective juror had heard anything about the case, read anything about the case, or discussed the case with anyone who purported to know anything about the case. None of the prospective jurors responded in the affirmative. The prosecutor also briefly recited the facts of the case and asked if any of the prospective jurors had heard anything about the case. Again, none of the prospective jurors responded in the affirmative. Finally, defense counsel requested that witness lists from both sides be read to the entire panel and this request was granted to further discern whether any jurors had any prior knowledge of the case. Again, there was no affirmative response. Since none of the jurors indicated any prior knowledge of the case, there was no need for individual voir dire on this issue. The murders occurred in Washington County in 1983 and the first trial was held in Washington County in 1985. Following reversal of the first conviction, venue was changed to Fayette County

and the second trial was not held until June 1994. Therefore, it is not surprising that none of the prospective jurors had heard about this case.

■ Related to the above issue is Appellant's complaint that the prosecutor was permitted to briefly summarize the facts of the case to the prospective jurors during voir dire. We are unable to perceive how a meaningful voir dire examination could be conducted without providing the prospective jurors with some information concerning the facts expected to be proven. Appellant does not claim that the jury was informed of any facts which were not subsequently proven at trial.

■ Appellant claims the trial judge erred by terminating his counsel's questioning of prospective jurors as to what they would want to know about a person convicted of intentional murder before deciding whether to sentence him to death. Understandably, many jurors who were so questioned found the inquiry confusing, and most responded, "I don't know." As the trial judge explained in his ruling:

> I am not sure that it's a proper question to ask a jury as to what she would need [to know to render a sentence], when we all know that jurors don't express their needs, but they get what they get. The fairness of the proceeding is that both sides get to offer [evidence] within the limits provided by law.

■ The extent of direct questioning by counsel during voir dire is a matter within the discretion of the trial court. *Grooms v. Commonwealth*, Ky., 756 S.W.2d 131, 134 (1988). The trial judge did not abuse his discretion by terminating this line of questioning.

*3. Excusals for cause.*

■ Three jurors were excused for cause because of their views regarding the death penalty. The first juror was unable or extremely reluctant to impose the death penalty; the second did not think she could impose the death penalty; and the third had a conscientious problem with the death penalty which was so strong that it would be in conflict with the law. The trial judge correctly excused these jurors. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 672 (1991), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991); *Davis v. Commonwealth*, Ky., 795 S.W.2d 942, 952 (1990).

■ The trial judge overruled Appellant's motion to excuse seven jurors for cause. The first had done research on the death penalty, but stated he was not biased in favor of the death penalty. The second was reluctant to impose the minimum penalty, but stated that he could consider the full range of penalties. The third and fourth jurors expressed confusion about the role of the indictment in the criminal process. However, the third juror stated that she would comply with the court's instructions as the "controlling principle" and that the defendant was not guilty yet because "the proceedings had not taken place." The fourth juror refused to tell defense counsel how he would vote, because he had not yet heard any evidence, but stated that he would presume Appellant to be innocent. There was no error in the failure to strike any of these four jurors. *Bowling v. Commonwealth*, Ky., 873 S.W.2d 175 (1993), *cert. denied*, 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1993); *Ward v. Commonwealth*, Ky., 695 S.W.2d 404 (1985).

■ Appellant sought to excuse the other three jurors because of their responses to his inquiry as to what they would want to know about a defendant before sentencing him to death. Appellant characterizes the fifth juror's response as a "lack of enthusiasm for mitigation evidence." However, the juror stated that she would consider any mitigating evidence and any aggravating evidence before making a decision. The sixth juror at first indicated that he was more concerned with the nature of the crime than the background of the criminal, but later stated that he would consider a person's background as well as the nature of the crime. The seventh juror clearly misunderstood the question and stated that she would not consider a sentence until she had proof that the defendant committed the crime. Finally, she stated that

she would consider not only the evidence heard in the guilt phase of the trial, but also any evidence in mitigation or aggravation which she heard in the penalty phase. Understandably, these three jurors were having difficulty with the nature of this question.

A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.

*Mabe v. Commonwealth,* Ky., 884 S.W.2d 668, 671 (1994). There was no error in the judge's refusal to disqualify these three jurors.

The trial began on June 13, 1994. The trial judge declined to excuse a juror who stated that she had vacation plans beginning June 24. At the conclusion of the guilt phase of the trial and before the beginning of jury deliberations, this juror was excused by mutual agreement of both parties. Thus, any potential for error was waived and we need not determine whether the designation of this juror as the alternate juror was an abuse of discretion. *See George v. Commonwealth,* Ky., 885 S.W.2d 938, 941 (1994); *Sanders v. Commonwealth, supra,* at 670; *Davis v. Commonwealth, supra,* at 949; *McQueen v. Commonwealth,* Ky., 669 S.W.2d 519, 521 (1984), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984).

### 4. Peremptory strikes.

The trial judge granted Appellant the peremptory strikes required by RCr 9.40(2), but refused his request for additional peremptories. When the issue was first raised, the trial judge instructed defense counsel to file an affidavit stating grounds for additional peremptories. No affidavit was filed. Whether to grant additional peremptories is within the discretion of the trial judge and we discern no abuse of that discretion in this case. *Bowling v. Commonwealth,* Ky., 942 S.W.2d 293, 308 (1997); *Smith v. Commonwealth,* Ky., 734 S.W.2d 437, 445

(1987), *cert. denied,* 484 U.S. 1036, 108 S.Ct. 762, 98 L.Ed.2d 778 (1988); *Brewster v. Commonwealth,* Ky., 568 S.W.2d 232, 236 (1978).

### 5. Possible violation of admonition.

At the beginning of the trial, the jury was admonished not to read any newspaper accounts that might pertain to the trial proceedings. During the trial, an article was published in the local newspaper which mentioned that Appellant had been previously tried and sentenced to death and that the verdict had been overturned on appeal. The trial judge declined to poll the jurors during the trial to determine if any had violated his previous admonition. Having properly admonished the jury not to read any newspaper articles about the trial, the trial judge was not required to inquire of them whether they had violated his admonition. Jurors are presumed to have followed an admonition. *Schweinefuss v. Commonwealth,* Ky., 395 S.W.2d 370, 375 (1965); *Huddleston v. Commonwealth,* 251 Ky. 172, 64 S.W.2d 450 (1933). The mere fact that a newspaper article was published creates no presumption that the jury violated the trial judge's admonition not to read it. *People v. Marshall,* 13 Cal.4th 799, 55 Cal.Rptr.2d 347, 919 P.2d 1280 (1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1338, 137 L.Ed.2d 497 (1997).

### 6. Other unpreserved jury issues.

Appellant also complains: (1) jurors were allowed to enter and exit the courtroom during general voir dire bench conferences; (2) the trial judge failed to admonish the jury between general and individual voir dire; (3) members of the victims' families entered the courtroom when the jury returned to the courtroom during deliberations to have testimony replayed; and (4) the jury was not sequestered between the return of their guilty verdicts and the beginning of the penalty phase of the trial. There were no contemporaneous objections to any of these occurrences and none remotely approaches the stature of error. We have specifically held that it is unnecessary to sequester the jury between the return of the guilt phase verdict and the beginning of the penalty phase of the trial. *Bowling v. Commonwealth, supra,* 873

S.W.2d at 182; *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872 (1992), *cert denied,* 507 U.S. 1034, 113 S.Ct. 1857, 123 L.Ed.2d 479 (1993).

## V. WITNESS ISSUES

### 1. Requested admonition.

 The trial judge declined Appellant's request that he admonish each witness individually to stay within the evidentiary boundaries established by the court. The trial judge informed the attorneys that it was their responsibility to so advise their witnesses and, in effect, that it was his responsibility to rule on objections raised in the event a witness exceeded those boundaries. He also advised defense counsel that the motion could be renewed during trial if circumstances warranted. No further requests were made during the trial. No error occurred in this regard.

### 2. Leading questions.

 Appellant complains that a number of leading questions were propounded by the prosecutor on direct examination of witnesses. This was a lengthy trial and all of the witnesses had previously testified at the first trial held nine years earlier. They were trying to remember events which occurred eleven years earlier. Appellant does not claim that the trial judge failed to sustain any objections made to leading questions, but only that the mere asking of the questions was prosecutorial misconduct. While the use of leading questions on direct examination is generally unacceptable, R. Lawson, *The Kentucky Evidence Law Handbook,* § 320, p. 161 (3rd ed., Michie, 1993), judgments will not be reversed because of leading questions unless the trial judge abused his discretion and a shocking miscarriage of justice resulted. *Askew v. Commonwealth,* Ky., 437 S.W.2d 205 (1969); *Meredith v. Commonwealth,* 265 Ky. 380, 384, 96 S.W.2d 1049, 1051 (1936). These cases were decided prior to the adoption of KRE 611(c), but the language of that rule makes it clear that the proscription against leading questions is not absolute. "Leading questions *should not* be used on the direct examination of a witness *except as may be necessary to develop the witness' testimony.*"

*Id.* (Emphasis added.) Our review of the record does not reveal any pattern of misconduct by the prosecuting attorney in this regard.

### 3. Hostile witness.

 The Commonwealth was permitted to examine Harold Southerland's widow, Norma Southerland, as a hostile witness. KRE 611(c); CR 43.05(a). Mrs. Southerland admitted to having had a sexual affair with Appellant and having used the name "Norma Tamme." She had been convicted of perjury as a result of her testimony at the first trial and the prosecutor was the chief witness against her at her own trial. There was no abuse of discretion in permitting the Commonwealth to examine Mrs. Southerland as a hostile witness. *Brown v. Commonwealth,* Ky., 440 S.W.2d 520 (1969).

### 4. Exclusion of witness and spectator.

 Appellant claims he was denied his right to a public trial because two priests were excluded from the courtroom during the guilt phase of the trial. The rule of exclusion had been invoked. KRE 615. Since one of the priests was scheduled to testify during the penalty phase, his exclusion was pursuant to the rule. As for the second priest, a judge has the right to control his own courtroom during a trial, and the exclusion of one spectator does not constitute a denial of a defendant's right to a public trial. *Turner v. Commonwealth,* Ky., 914 S.W.2d 343 (1996); *Wilson v. Commonwealth, supra.*

### 5. Testimony of absent witness.

 Dr. David Wolfe, the state's forensic anthropologist, testified for the Commonwealth at the first trial. He died prior to the retrial and his previous testimony was read to the jury. KRE 804(a)(4) and (b)(1). The trial judge informed the jury that Dr. Wolfe was deceased. Appellant asserts the jury should have been informed only that Dr. Wolfe was "unavailable." The trial judge correctly informed the jury of the true reason for Dr. Wolfe's absence; otherwise, the jury might have assumed a reason which could have affected the credibility of his testimony.

■ Nor do we find any error in the method by which Dr. Wolfe's prior testimony was presented to the jury. One of the prosecutors read the questions and another read Dr. Wolfe's responses while seated in the witness chair. This is a standard practice in presenting prior testimony, and this question-and-answer format makes it easier for the jurors to follow and understand testimony which is being read to them. We note in passing that the prosecutor who read Dr. Wolfe's answers was not the same prosecutor who examined most of the witnesses and delivered the closing argument.

### 6. Impeachment.

■ The Commonwealth impeached both of Appellant's alibi witnesses by asking each the number of his felony convictions instead of merely asking each whether he had been convicted of a felony. *See* KRE 609(a); *Commonwealth v. Richardson*, Ky., 674 S.W.2d 515 (1984). There was no contemporaneous objection to these inquiries and we are unpersuaded that the result would have been different if the responses had been in the singular rather than the plural. *Cosby v. Commonwealth, supra.* We note that defense counsel initiated this concept by asking the same question during his cross-examination of the prosecution's chief witness, William Buchanon. Having employed this strategy himself, it is not surprising that counsel did not object when the prosecutor followed suit.

### 7. Cross-examination of Appellant.

■ Appellant was questioned concerning pro se pleadings he filed in his own behalf. He responded that the pleadings were prepared by Eugene Gall, an inmate legal aide. The court sustained the objection to this reference and no admonition was requested, thus no error occurred. *Hall v. Commonwealth*, Ky., 817 S.W.2d 228 (1991). Appellant then objected to the entire "pro se" inquiry on relevancy grounds and the objection was overruled. The evidence was relevant to prove that Appellant was an intelligent and educated man rather than a "poor farmer." (In reversing Appellant's first conviction, we had directed that upon retrial the prosecutor should not identify the true na-

ture of Appellant's farming operation, *i.e* ., marijuana cultivation.)

■ In addition to Buchanon's testimony, the Commonwealth produced Jim Norvell, who testified that he was present when Southerland and Maddox were killed, but did not actually see the killings. Norvell testified that he heard the shots, that Appellant told him he had just shot the two men, and that Appellant instructed him to dispose of one of the weapons. Appellant later borrowed a bulldozer from Jim Wilson. Wilson testified that Appellant told him that he had shot two men in the head, covered their bodies with rock and lime, and needed the bulldozer to ensure that the bodies stayed buried. Harold Southerland's widow, Norma Southerland, testified that she had been having an affair with Appellant during 1983 and that her husband, Harold Southerland, had struck her on occasions. There was evidence that Appellant had threatened bodily harm against Harold if he struck Norma again. On cross-examination, the prosecutor asked Appellant whether Buchanon, Norvell, Wilson and Norma Southerland each had "lied" insofar as their testimony contradicted that of Appellant. While we do not approve of this type of cross-examination, *i.e.*, asking one witness to characterize the testimony of another, *Moss v. Commonwealth*, Ky., 949 S.W.2d 579, 583 (1997), there was no contemporaneous objection and we are unpersuaded that absent this inquiry, the result would have been different. *Cosby v. Commonwealth, supra.*

■ Along the same lines, the prosecutor asked Appellant if he knew of any motive for Buchanon and Wilson to testify against him. Appellant complains that the question was unfair, because the prosecutor knew Appellant could not reveal to the jury that Buchanon's motive was that he believed Appellant had cheated him out of $50,000.00 to $100,-000.00 worth of marijuana. Instead, Appellant explained that he had once refused to post a bail bond for Wilson regarding a criminal charge and that he had refused to help Buchanon pay off a debt. This issue was not preserved; and since Appellant was able to make a plausible response to the question, no harm was done.

Appellant testified on direct examination that his wife told him that "either Harold or one of his brothers gave blood" to Appellant when he had emergency surgery in 1969. On cross-examination, the prosecutor pointed out that Harold Southerland would have been only nine or ten years old in 1969. Appellant asserts that this was an improper insinuation that he had lied. We discern no impropriety. Finally, Appellant makes vague complaints about "abusive questioning" and refusal to permit Appellant to explain his answers. None of these alleged errors were preserved and examination of the record reveals only a vigorous cross-examination, not a pattern of abusive conduct.

## VI. THE GLIDEWELL PERJURY

In 1986, after Appellant's first convictions and before they were reversed on appeal, Appellant filed a motion for a new trial based on a newly discovered alibi witness, Harold Glidewell. Glidewell testified at the hearing on the motion that he had been with Appellant in Indiana on the day of the murders. He further testified that William Buchanon, the chief witness against Appellant, had admitted to him that he (Buchanon) had committed the murders. The Commonwealth was able to discredit Glidewell's testimony by establishing that he was incarcerated in the Barren County jail on the day of the murders, thus could not have been in Indiana with Appellant as claimed. Glidewell later pled guilty to perjury with respect to this testimony.

At the second trial, the prosecutor was permitted to cross-examine Appellant with respect to Glidewell's perjury. Appellant admitted that Glidewell had testified to the alleged alibi, that the testimony was false, and that Glidewell had been convicted of perjury as a result. Appellant claims that the introduction of this evidence amounted to improper impeachment by use of a specific instance of conduct.

Although the credibility of a witness may be attacked by a party who wishes to discredit his testimony, this entitlement to impeach is not without limitations. Prior to the adoption of the Kentucky Rules of Evidence, CR 43.07 and corresponding case law strictly prohibited the use of "particular wrongful acts" as a basis for impeachment of a witness's credibility. *Shirley v. Commonwealth,* Ky., 378 S.W.2d 816 (1964); *Daugherty v. Kuhn's Big K Store,* Ky.App., 663 S.W.2d 748 (1983). The initial draft of the Kentucky Rules of Evidence contained a similar restriction within KRE 608, which was identical to its federal counterpart, FRE 608(b), and which prohibited impeachment "by specific instances of conduct." KRS 422A.0608 (repealed Ky. Acts 1992 ch. 324 § 31). This restriction was removed by a legislative floor amendment prior to the enactment of the Rules. 1992 Ky. Acts ch. 324 § 14. (The amendment also deleted a provision permitting cross-examination of a character witness by use of specific instances of conduct.) Thus, KRE 608 was adopted without a specific prohibition against impeachment by specific instances of conduct. However, neither does the Rule authorize that method of impeachment. CR 43.07 has not been repealed and remains as authority that a witness may not be impeached by "particular wrongful acts." The question then becomes whether the evidence is relevant in and of itself for a purpose other than impeachment.

Evidence of other crimes, wrongs or acts is admissible if relevant for some purpose other than to prove character, "*such as* proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." KRE 404(b)(1) (emphasis added). While the rule describes some examples of other purposes, "it states the 'other purpose' provision in a way that leaves no doubt that the specifically listed purposes are illustrative rather than exhaustive." Lawson, *supra,* § 2.25, p. 87. We have previously held that the type of spoliation of evidence represented by the Glidewell perjury is relevant and admissible as evidence inconsistent with a defendant's innocence, thus akin to an admission of guilt.

> Any attempt to suppress a witness' testimony by the accused, whether by persuasion, bribery, or threat, or to induce a witness not to appear at the trial *or to swear falsely,* or to interfere with the pro-

cess of the court is evidence tending to show guilt.

*Foley v. Commonwealth,* Ky., 942 S.W.2d 876, 887 (1996). (Emphasis added.) *See also Collier v. Commonwealth,* Ky., 339 S.W.2d 167 (1960) (threat to kill the complaining witness if she did not take action to have the charges dismissed); *Davis v. Commonwealth,* 204 Ky. 601, 265 S.W. 10 (1924) (letter from defendant to prospective witness offering to bribe him to testify in a certain manner); *Wilhite v. Commonwealth,* 203 Ky. 543, 262 S.W. 949 (1924) (threat to kill witness if he told what he knew and attempt to carry out the threat after the witness testified before the grand jury); *Turpin v. Commonwealth,* 140 Ky. 294, 130 S.W. 1086 (1910) (attempt by defendant to bribe a juror).

The United States Supreme Court stated a century ago that the "destruction, suppression or fabrication of evidence undoubtedly gives rise to a presumption of guilt to be dealt with by the jury." *Wilson v. United States,* 162 U.S. 613, 621, 16 S.Ct. 895, 899, 40 L.Ed. 1090, 1095 (1896). Later, Judge Learned Hand wrote, "[t]he fabrication of false documentary evidence ... has from the earliest times been treated as strong evidence of guilt." *United States v. Werner,* 160 F.2d 438, 441 (2nd Cir.1947). *See also United States v. Bongard,* 713 F.2d 419 (8th Cir.1983); *United States v. Hall,* 565 F.2d 1052 (8th Cir.1977); *United States v. Freundlich,* 95 F.2d 376, 378–79 (2nd Cir. 1938). The relevance of such fabrication is that it tends to show a "consciousness of guilt," *United States v. Bongard, supra,* at 420, *Rollins v. The Board of Governors for Higher Education,* 761 F.Supp. 939, 941 (1991), in that an innocent person would not feel the need to fabricate evidence.

The facts of this case are strikingly similar to those in *McQueeney v. Wilmington Trust Co.,* 779 F.2d 916 (3rd Cir.1985). In *McQueeney,* the plaintiff was an officer of a supertanker owned by the defendant. While manning a water hose on the ship, the plaintiff slipped and injured his back. Suit was filed under the Jones Act, 46 U.S.C. § 688, *et seq.,* alleging negligence by the ship's owner. During the discovery phase of the case,

plaintiff's counsel informed defense counsel that he had located an eyewitness to the accident. In his pre-trial deposition, the witness, De la Cerda, corroborated the plaintiff's account "in all significant respects." *Id.* at 918. Defense counsel subsequently received a crew list of the ship at the time of the accident, which showed that De la Cerda had not joined the crew until three months after the accident, thus could not have been an eyewitness to the accident. When the plaintiff did not offer De la Cerda's deposition at trial, the defendants proffered it as evidence of fraud on the court. The trial court held that since the plaintiff had not offered the deposition at trial, no fraud occurred. On appeal, the Court of Appeals for the Third Circuit held that the evidence was relevant and admissible.

The intuitive appeal of defendants' proffer is immediate. One who believes his own case to be weak is more likely to suborn perjury than one who thinks he has a strong case, and a party knows better than anyone else the truth about his own case. Thus, subornation of perjury by a party is strong evidence that the party's case is weak. Admittedly the conclusion is not inescapable: parties may be mistaken about the merits or force of their own cases. But evidence need not lead inescapably towards a single conclusion to be relevant, it need only make certain facts more probable than not. The evidence of subornation here does cast into doubt the merits of McQueeney's claim, even if it does not extinguish them.

There is ample support among both scholars and courts for this line of argument. Wigmore calls the inference "one of the simplest in human experience":

It has always been understood—the inference indeed is one of the simplest in human experience—that a party's *falsehood* or *other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that conscious-

ness may be inferred the fact itself of the cause's lack of truth and merit.

2 Wigmore § 278(2) (Chadbourne Rev. 1979). McCormick makes a similar point:

[W]rongdoing by the party in connection with his case, amounting to an obstruction of justice[,] is also commonly regarded as an admission by conduct. By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means. Accordingly, a party's false statement about the matter in litigation, whether before suit or on the stand, his fabrication of false documents, his undue pressure, by bribery or intimidation or other means, to influence a witness to testify for him ... all these are instances of this type of admission by conduct.

McCormick's Handbook on the Law of Evidence § 273 at 660 (2d ed.1972).

*McQueeney v. Wilmington Trust Co., supra,* at 921–22.

It is argued that by admitting the Glidewell perjury on the basis of this "admission by conduct" principle, Appellant may be prejudiced by the act of a third party to which he had no real involvement, *i.e.,* the fabrication was concocted by Glidewell alone. The *McQueeney* court also addressed this issue:

Of course, it is not certain that McQueeney did suborn perjury; De la Cerda may have had other reasons for making up his story. But the circumstances of the case and the correlation between McQueeney's story and De la Cerda's deposition suggest that subornation of perjury by McQueeney is a possibility that the jury should have been allowed to consider.

*Id.* at 923. Likewise, the fact that Appellant called Glidewell as a witness in support of his own motion for a new trial and sat silently by while Glidewell committed what Appellant knew was perjury creates an inference that Appellant was involved in the fabrication of Glidewell's testimony sufficient to satisfy KRE 401. The jury was entitled to infer that Glidewell did not simply come out of the woodwork (or the Barren County Jail) to commit perjury for Appellant out of the goodness of his heart.

It is of no significance that this is a criminal case and *McQueeney* was a civil case, for KRE 404(b) applies to both civil and criminal cases. *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356 (10th Cir.1987); *Dosier v. Miami Valley Broadcasting Corp.,* 656 F.2d 1295 (9th Cir.1981); Lawson, *supra,* § 230, p. 107. Nor is it of any consequence that the trial judge reached the correct result for the wrong reason. *Cf. Newman v. Newman,* Ky., 451 S.W.2d 417, 420 (1970); *Commonwealth v. Congleton,* 267 Ky. 22, 101 S.W.2d 210 (1937); 24 C.J.S., *Criminal Law* § 1707.

Having determined the evidence to be relevant, the issue becomes whether the evidence was more prejudicial than probative. KRE 403. Courts which have considered the issue have routinely held such evidence to be more probative than prejudicial. *E.g., Wallace v. United States,* 243 F. 300 (7th Cir.1917).

The testimony that Wallace induced him to falsely deny these subsequent transactions was unquestionably prejudicial to the defense. But not more so in this than in any case where it is testified that a party to a transaction has attempted to suppress evidence bearing thereon.

*Id.* at 308. As in *McQueeney v. Wilmington Trust Co., supra,* the evidence of Glidewell's perjury was relevant and its prejudicial effect was outweighed by its probative value.

Although the Commonwealth initially intended not to introduce this evidence, the prosecutor changed his mind when Appellant produced two new alibi witnesses, both of whom were convicted felons. KRE 404(c) requires the Commonwealth to give notice to a defendant of its intent to introduce evidence of other crimes, wrongs or acts. However, that rule is of no benefit to Appellant in this case. "The intent of [KRE 404(c)] is to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial." Lawson, *supra,* § 2.25, p. 106. Obviously, no prejudice occurred, because Appellant had actual notice of this evidence and raised the KRE 404(b) issue both in his own *in limine* motion and when the evidence

was offered at trial. *Bowling v. Commonwealth, supra,* 942 S.W.2d at 300. KRE 404(c) permits the trial judge "for good cause shown" to excuse the failure to give the required notice. No error occurred with respect to the admission of this evidence.

## VII. OTHER EVIDENCE ISSUES

### 1. The Norvell issue.

Appellant's counsel sought to elicit from Detective Knifley his opinion as to whether prosecution witness Jim Norvell (who had already testified) had committed certain criminal offenses, such as hindering prosecution or tampering with physical evidence. The trial judge sustained the prosecutor's objection and no avowal was offered to preserve the testimony. KRE 103(a)(2); *Jones v. Commonwealth,* Ky., 833 S.W.2d 839, 841 (1992). Regardless, a witness generally cannot testify to conclusions of law. *Gibson v. Crawford,* 259 Ky. 708, 722, 83 S.W.2d 1, 7 (1935). Defense counsel offered to "rephrase" the question and asked Knifley whether Norvell was charged with any criminal offenses as a result of his conduct. Knifley responded that Norvell was not charged. Thus, defense counsel elicited the only testimony Knifley was competent to render on this subject.

### 2. The Maddox letter.

Appellant was prevented from introducing a letter written by Neal Maddox to someone named "Greg" in California. Maddox's mother had found the letter in Maddox's bedroom after his death. The relevant portion (with misspelled words corrected) reads as follows:

> I would like to see you and your wife and maybe we could drink a few beers one of these days and go see some of your old friends. I don't know where all of them are, but Charley and a few of them are in the Cross Bar Motel up at LaGrange, Kentucky, if you know what I mean. And if I don't get a job pretty soon, I might be there or about six feet under pushing up daisies, because I know where they keep the money and I know how to get some of it, but I would hate like hell to get caught. I have planned how to pull it off, but it

would take at least three people to do it and get by with it. And the more people involved, the better chance there is of getting caught. So maybe I can go back to work pretty soon and stay out of the slammer.

Appellant theorizes that since Maddox was discussing in the letter the possibility of committing a crime, someone else might have had a motive to kill him. But since the letter was never mailed, it is impossible to speculate how his intended victims could have learned that Maddox was contemplating criminal conduct against them. The obvious purpose of this evidence was to prove Maddox's criminal disposition. Although evidence of a "pertinent trait of character" of a victim is admissible, KRE 404(a)(1), *e.g., Johnson v. Commonwealth,* Ky., 477 S.W.2d 159 (1972), Maddox's general criminal disposition was irrelevant to Appellant's guilt or innocence. Furthermore, character can be proven only by evidence of general reputation or by opinion, not by specific instances of conduct. KRE 405(a); *Thompson v. Commonwealth,* Ky., 652 S.W.2d 78 (1983). The letter was properly excluded.

### 3. Buchanon's guilty plea.

We have previously addressed Appellant's complaint that he was unable to discover enough evidence concerning Buchanon's plea agreement. Now we address his complaint that the prosecution was permitted to introduce that evidence at trial. In order to defuse Appellant's anticipated impeachment of Buchanon by showing that he had received a "deal" for his testimony, the Commonwealth presented that evidence during its direct examination of Buchanon. There was no contemporaneous objection, but Appellant now claims that the introduction of evidence that his co-indictee entered a guilty plea to the same charge was prejudicial to his defense. There is ample authority to support this assertion as a general proposition. *E.g., Linder v. Commonwealth,* Ky., 714 S.W.2d 154 (1986); *Tipton v. Commonwealth,* Ky., 640 S.W.2d 818 (1982); *Parido v. Commonwealth,* Ky., 547 S.W.2d 125 (1977). However, an exception to the rule occurs when the defendant permits the introduction

of such evidence without objection for the purpose of trial strategy, *Brock v. Commonwealth*, Ky.App., 627 S.W.2d 42, 44 (1981), *cert. denied*, 456 U.S. 1009, 102 S.Ct. 2302, 73 L.Ed.2d 1305 (1982), and that was clearly the reason for Appellant's failure to object to this evidence at trial. His theory of the case was that Buchanon committed the murders and tried to lay the blame on him. In that context, the fact that Buchanon admitted his involvement supported Appellant's alibi. Having employed that strategy, Appellant cannot be heard to complain after the strategy failed. *Id.*

### 4. Utterance of the word "polygraph."

■■■ During his cross-examination of Buchanon, Appellant's counsel inquired about an interview at the London state police post. Buchanon interrupted and uttered the words "this for a polygraph." It turns out that the interview in question did not occur at the London state police post, but at the state police polygraph laboratory, and that Buchanon's statement was an inadvertent reflex correction. Appellant asserts error in reliance on *Morgan v. Commonwealth*, Ky., 809 S.W.2d 704 (1991). In *Morgan*, a polygraph examiner, who was identified to the jury as a police officer possessing "special interrogation skills," described the room in which Appellant had given an incriminating statement as containing a desk, two chairs, a two-way mirror, and a polygraph instrument on top of the desk. We held that the reference to the polygraph was intentional and created a clear inference that Appellant had taken and failed a polygraph examination. The case *sub judice* is more like *McQueen v. Commonwealth*, *supra*, in which we held that an indefinite, ambiguous reference to "polygraph examiner" was not prejudicial error. There was no statement that any test had been administered and the statement was vague as to whom, if anyone, it had been administered. "There must arise a clear inference that there was a result and that the result was favorable, or some other manner in which the inference could be deemed prejudicial." *Id.* at 522. Buchanon did not testify that he underwent a polygraph examination, much less that he passed it. The mere inadvertent

utterance of the word "polygraph" is not grounds for reversal.

### 5. "Bolstering" of Buchanon's testimony.

■■■ The prosecutor inquired of Detective Knifley whether there was anything of significance in Buchanon's statements that he was unable to verify. Defense counsel objected to the question only on the grounds that it "went to the ultimate issue," which obviously it did not. If anything, the question was objectionable as an improper attempt to bolster Buchanon's testimony by implying that Knifley had proven that everything Buchanon told him was true. Error is not preserved if the wrong reason is stated for the objection. *Harrison v. Commonwealth*, Ky., 858 S.W.2d 172 (1993), *cert. denied*, 512 U.S. 1238, 114 S.Ct. 2746, 129 L.Ed.2d 864 (1993); *Ruppee v. Commonwealth*, Ky., 821 S.W.2d 484 (1991). Regardless, Knifley's response was that except for Buchanon's reference to a .45 caliber pistol (being used in the commission of the murders), everything Knifley was able to obtain as evidence came as a result of Buchanon's information. Thus, even if the question could be construed as an attempt to elicit improper information, the response was harmless.

■■■ Appellant also asserts that Donnie Sanford was permitted to bolster Buchanon's testimony. Sanford testified only that Buchanon "just told me about two guys that [were killed there.]" Obviously, Southerland and Maddox were killed and the jury already knew that Buchanon had pled guilty to his involvement in the murders. Sanford's testimony did not incriminate Appellant, thus, there was no prejudice.

### 6. Wilson's interpretation of Appellant's statement.

■■■ Jim Wilson testified that Appellant told him that "somebody" had done something really bad to a friend of his and that he was going to have to take care of "him" and that Appellant later said that he had "taken care of them." The prosecutor then asked Wilson what Appellant meant by this statement and Appellant asserts reversible error in that regard. We agree that a witness should not attempt to interpret what

another witness meant by what he said. *Adcock v. Commonwealth,* Ky., 702 S.W.2d 440, 442 (1986). However, Wilson's response was merely, "I assumed that he meant that he was going to cause them harm, what kind I don't know." There was no contemporaneous objection to the question and we are unpersuaded that Wilson's innocuous response changed the result of this case. *Cosby v. Commonwealth, supra.*

### 7. References to previous trial.

■ Prior to trial, all parties agreed that the phrase "previous hearing" would be used to refer to Appellant's first trial. During cross-examination by defense counsel, William Buchanon made three references to a "prior hearing" and one reference to a "previous trial." Defense counsel brought the references to the trial judge's attention, but did not request an admonition. During cross-examination by defense counsel, James Norvell referred to "one of the other trials." Thirty-two minutes later, at the conclusion of his cross-examination, defense counsel moved for a mistrial, which was overruled. We note that during cross-examination of Norvell about his previous statements, defense counsel referred to statement No. 1 as a police interview, statement No. 2 as "first court testimony," and statement No. 3 as "second court testimony." During cross-examination by defense counsel, Jim Wilson referred to matters occurring previous or subsequent to "the trial." Appellant did not request an admonition or a mistrial as a result of those references. We are not prepared to presume that the jury must have concluded from these isolated references that Appellant had been previously convicted of murder and sentenced to death for these same charges. Appellant's citation to *Miracle v. Commonwealth,* Ky., 646 S.W.2d 720 (1983) is misplaced. Jurors who sat on the *Miracle* case had been present in the courtroom when the defendant entered a guilty plea which was later withdrawn.

### 8. The insurance claim.

■ Appellant next asserts that contrary to our mandate in *Tamme v. Commonwealth, supra,* at 53, the Commonwealth introduced evidence that he and his wife filed a fraudulent insurance claim concerning a wrecked automobile. The fact that an insurance claim was filed was relevant to prove the date on which Appellant and Buchanon removed the victims' remains from a ravine, burned them, and dumped the ashes into a creek. Buchanon testified that he did not recall the exact date, but that it was the same day that he overheard Appellant direct his wife to call the insurance company and file a claim for his wrecked automobile. Later, Detective Knifley introduced the insurance claim form which bore the date of November 20, 1983. A review of this testimony and of the claim form reveals nothing from which the jury could have inferred that the claim was fraudulent.

### 9. Evidence regarding Norma Southerland.

■ Appellant claims error in the introduction of evidence that Norma Southerland was pregnant with Appellant's child, that she purchased a .357 Ruger revolver on July 5, 1983, one month before her husband disappeared, that she obtained a restraining order against her mother-in-law after her husband's disappearance, that she received life insurance benefits as a result of her husband's death, and that she did not attend his funeral. There was no contemporaneous objection to any of this evidence.

We reversed Appellant's first conviction partially because of the introduction of evidence that Appellant was engaged in cultivation of marijuana and trafficking in cocaine, which the Commonwealth claimed tended to prove Appellant's motive in killing the victims. We disagreed. "The evidence of motive, what little there was, tended to prove some sort of jealous-lovers scenario, not a drug deal gone sour." *Tamme v. Commonwealth, supra,* at 54. Thus, on retrial, the Commonwealth sought to prove that Appellant's motive in killing Southerland was related to Appellant's sexual affair with Southerland's wife. In that respect, the fact that Norma Southerland was carrying Appellant's child (she subsequently named the child "Frank") was relevant to prove motive. The evidence regarding the purchase of the .357 Ruger contradicted Norma's testimony that her husband had given her the weapon as a

birthday present. There was evidence that the restraining order was obtained by Norma to keep her mother-in-law from constantly contacting her to see if Norma had any new information about her husband's disappearance. The fact that Appellant's paramour received substantial life insurance proceeds as a result of her husband's death was relevant to the issue of motive. Finally, the fact that Norma did not attend her husband's funeral supported the Commonwealth's theory that she and Appellant were having an affair, *i.e.*, the jealous-lover scenario.

### 10. Hearsay.

■ Appellant claims six instances of erroneous admission of alleged hearsay evidence. The first involved the testimony of Gary Belcher, Appellant's supervisor at the local DES office. The Commonwealth sought to establish that Appellant made several telephone calls from his place of employment to the Southerland residence, as well as to Wilson, Maddox, Norvell and Buchanon. At Detective Knifley's request, Belcher asked eleven employees who had worked with Appellant during the time frame in question to sign a form indicating whether or not they had placed telephone calls to the persons in question. Belcher introduced the forms to prove that no one else in the office had placed those calls, *ergo,* the calls must have been placed by Appellant. The prosecutor had issued subpoenas for each of the DES employees who completed the questionnaires. However, prior to trial, the parties entered into a stipulation which the prosecutor interpreted to be an agreement that it would be unnecessary for these eleven witnesses to testify at trial. In reliance upon this stipulation, the prosecutor excused the witnesses. When Belcher proposed to introduce the completed questionnaires, defense counsel argued that the stipulation addressed only the authenticity, not the admissibility, of the questionnaires. Although the stipulation did not specifically state that the questionnaires would be admissible as evidence, it did state that the "completed questionnaires are complete on their face and indicate the requested responses." In addition, there was a specific stipulation as to the authenticity and genuineness of the questionnaires. While the

stipulation could have been more artfully drafted, we can discern no purpose for its existence other than to permit the introduction of the completed questionnaires into evidence without the necessity of producing eleven witnesses, each of whom could have easily authenticated his or her own questionnaire. KRE 901(b)(1). In view of the stipulation, there was no error in the admission of the questionnaires.

■ Barbara Southerland, Harold Southerland's sister-in-law, testified that Neal Maddox told her on the day of the murders that he and Harold were going to work on a fence. Defense counsel's objection was sustained, but Appellant asserts the trial judge erred in failing to admonish the jury not to consider this testimony. No admonition was requested, thus no error occurred. *Hall v. Commonwealth, supra.* Similarly, there were no objections to the alleged hearsay testimony of Harold Southerland's mother to the effect that she was told that Harold was missing and that Norma Southerland's mother told her she did not know where Norma was on that date. Nor was there any objection to the testimony of Susie Mills regarding statements made to her by Norma Southerland and William Buchanon. By this point in the trial, both Norma Southerland and Buchanon had already testified and Buchanon had specifically testified as to what he had said and showed to Susie Mills. We are unpersuaded that the introduction of any or all of these statements changed the result of this trial. *Cosby v. Commonwealth, supra.*

■ Buchanon's testimony that Harold Southerland never said anything to indicate that he was afraid of Appellant was not hearsay. Buchanon's testimony that Harold Southerland must have known that Appellant was having an affair with Harold's wife is more in the nature of an opinion than hearsay. Since he was basing this opinion on his own factual observations, there was no error. KRE 701; *United States v. Smith,* 550 F.2d 277 (5th Cir.1977), *cert. denied,* 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977). When testifying that on the date of the murders, Appellant "got a gun and put it in the Jeep," Buchanon added that "Frank was well known

to carry a gun." Appellant claims this was hearsay. There was no attempt to clarify this statement and it could just as well have been a statement of Buchanon's own knowledge. Viewed in that context, the statement was not hearsay.

### 11. Humanization of victims.

There was no error in permitting the mothers of the victims to introduce life photographs of their deceased sons. *Bussell v. Commonwealth, supra,* at 113; *Templeman v. Commonwealth,* Ky., 785 S.W.2d 259 (1990). Nor are we persuaded that Appellant's right to a fair trial was impaired because the prosecutor occasionally referred to the victims as "boys." Southerland was twenty-five years old and Maddox was twenty-six years old at the time of their deaths.

### 12. Skeletal remains of victims.

The Commonwealth introduced partial skeletal remains of the victims as well as slides, photographs and testimony relating to those remains. Most of the evidence was introduced during the testimony of Dr. Wolfe, the state forensic anthropologist, to explain his testimony and to corroborate Buchanon's testimony concerning the methods used to dispose of the bodies. Even gruesome photographs are admissible if they have probative value. *Epperson v. Commonwealth,* Ky., 809 S.W.2d 835 (1990), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). Likewise, bones and bone fragments from a victim's body are admissible if relevant. *Tackett v. Commonwealth,* 245 Ky. 98, 53 S.W.2d 218 (1932); *Robey v. Commonwealth,* 243 Ky. 407, 48 S.W.2d 822 (1932). Evidence that a defendant attempted to dispose of or conceal evidence, including the body of his victim, is relevant in a criminal case. *Halvorsen v. Commonwealth,* Ky., 730 S.W.2d 921, 926 (1987), *cert. denied,* 484 U.S. 970, 108 S.Ct. 468, 98 L.Ed.2d 407 (1987); *Murtaugh v. Commonwealth,* Ky., 579 S.W.2d 619, 621 (1979).

### 13. Alleged prosecutorial misconduct.

Appellant's claim that the Commonwealth knowingly introduced false testimony is without merit. The fact that Buchanon served eleven months and two weeks in jail was true, even though the time was served prior to entry of his guilty plea. Appellant asserts that in 1985, the prosecutor submitted a document recommending that Buchanon be permitted to plead guilty to criminal facilitation to murder because he did not know in advance that the victims were going to be killed, whereas subsequent discovery of his pretesting for a polygraph examination interview revealed that Buchanon was ambivalent with respect to his prior knowledge. We fail to see how this out-of-court information affected the outcome of this trial. In 1990, the Commonwealth filed an affidavit of Buchanon stating "I have received no favorable treatment, I got no favors, I spent one year in jail, and I got out broke." Appellant asserts this was directly contrary to the Commonwealth's opening statement at trial that Buchanon "got some consideration." Again, we fail to see how this alleged contradiction had any impact on Appellant's right to a fair trial.

## VIII. INSTRUCTIONS

### 1. Guilt phase.

Appellant claims he was entitled to instructions on first-degree manslaughter (under extreme emotional disturbance), second-degree (wanton) manslaughter, wanton murder, and the defense of intoxication. Appellant denied killing Southerland and Maddox and no one testified to having actually witnessed the killings. To be entitled to an instruction on first-degree manslaughter premised upon extreme emotional disturbance, there must be evidence of an event triggering an explosion of violence on the part of the defendant. *Whitaker v. Commonwealth,* Ky., 895 S.W.2d 953 (1995); *Foster v. Commonwealth,* Ky., 827 S.W.2d 670, 678 (1991), *cert. denied,* 506 U.S. 921, 113 S.Ct. 337, 121 L.Ed.2d 254 (1991). Appellant asserts the jury could have believed that the "triggering event" was his desire to retaliate against Harold Southerland for his alleged beatings of Norma Southerland. However, Norma Southerland testified that she did not tell Appellant about the alleged beatings; and Appellant did not testify that he knew of any such beatings. Jim Wilson's testimony that at another time and place, Appellant

made a vague threat against "somebody" was insufficient to warrant an instruction that Appellant killed Southerland and Maddox while acting under extreme emotional disturbance. Such an instruction is justified only "when there is probative, tangible and independent evidence on initiating circumstances, such as provocation at the time of [the defendant's] act which is contended to arouse extreme emotional disturbance." *Morgan v. Commonwealth*, Ky., 878 S.W.2d 18, 21 (1994), quoting *Wellman v. Commonwealth*, Ky., 694 S.W.2d 696, 697–98 (1985).

Nor was there any evidence to support an instruction on either degree of wanton homicide. An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that he is guilty of the lesser offense. *Webb v. Commonwealth*, Ky., 904 S.W.2d 226 (1995). Both victims in this case were shot in the head. There was no evidence from which a reasonable juror could believe that Appellant unintentionally killed either of them. *Foster v. Commonwealth*, *supra*, at 678; *cf. Hayes v. Commonwealth*, Ky., 625 S.W.2d 583 (1981).

Appellant did not request an instruction on intoxication, thus this issue is not preserved. RCr 9.54(2); *McGinnis v. Commonwealth*, Ky., 875 S.W.2d 518 (1994). Regardless, the evidence did not support an intoxication instruction. Although there was some evidence that Appellant had been drinking beer prior to the murders, there was no evidence that he was so intoxicated as to be unable to form the requisite intent to commit the murders. *Commonwealth v. Tate*, Ky., 893 S.W.2d 368, 371–72 (1995); *Stanford v. Commonwealth*, Ky., 793 S.W.2d 112 (1990).

*2. Penalty phase.*

The trial judge denied Appellant's request for an instruction on the mitigating circumstance of being an accomplice. KRS 532.025(2)(b)5. Accomplice participation is a mitigating factor only if such participation is "relatively minor." *Id.; Halvorsen*

*v. Commonwealth, supra.* Although Buchanon entered an *Alford* plea to complicity to murder, there was no evidence that anyone but Appellant shot Southerland and Maddox. Appellant was not indicted for complicity and the guilt phase instructions would not have permitted the jury to find him guilty as an accomplice. Those instructions allowed the jury to convict Appellant of the two murders only if they believed beyond a reasonable doubt that he "shot [each victim] with a gun and thereby caused his death." Having necessarily found that Appellant was the "trigger man" in both murders, the jury could not have believed that his participation in those murders was "relatively minor."

None of the other penalty phase issues raised on appeal were preserved by contemporaneous objection or by tendered instructions. RCr 9.54(2); *McGinnis v. Commonwealth, supra.* The evidence of intoxication was insufficient to warrant an instruction on that mitigating circumstance. KRS 532.025(2)(b)7. Appellant's claim of entitlement to an instruction on "moral justification or extenuation", KRS 532.025(2)(b)4, was not supported by any evidence at all. The instruction on mitigating circumstances included the catch-all provisions, "any other circumstance or circumstances arising from the evidence which you, the jury, deem to have mitigating value," and "those aspects of the defendants' character and the facts and circumstances of the offense about which he has offered evidence in mitigation." There was no need to instruct on any specific nonstatutory mitigators. *Haight v. Commonwealth*, Ky., 938 S.W.2d 243 (1996); *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148 (1995), *cert. denied*, — U.S. —, 117 S.Ct. 151, 136 L.Ed.2d 96 (1996),; *Sanders v. Commonwealth, supra.* The instructions did not imply that unanimity was required on mitigators and there is no requirement that a jury be instructed that their findings on mitigation need not be unanimous. *Bowling v. Commonwealth, supra*, 873 S.W.2d at 180. Nor is there a constitutional requirement to provide a formal definition of mitigating circumstances or their function. "Jury instructions at the sentence stage of a capital trial need not include any particular words or

phrases to define the concept of mitigation or the function of mitigating circumstances." *Waters v. Thomas*, 46 F.3d 1506, 1528 (11th Cir.1995), *cert. denied*, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995).

 Appellant complains that the jury was not informed that the standard of proof for mitigating circumstances is "the preponderance of the evidence." Since a jury is not required to make findings with regards to mitigators, but only to consider them, there is no need to define the standard of proof. *Cf. Bowling v. Commonwealth, supra*, 873 S.W.2d at 180; *Skaggs v. Commonwealth*, Ky., 694 S.W.2d 672 (1985), *cert. denied*, 502 U.S. 844, 112 S.Ct. 140, 116 L.Ed.2d 106 (1991). Nor is there any requirement to instruct the jury on "residual doubt" as a mitigating factor. *Bussell v. Commonwealth, supra*, at 115.

 With respect to each murder, the jury was instructed as to only one aggravating circumstance, *i.e.*, "The defendant's act or acts of killing were intentional and resulted in multiple deaths." KRS 532.025(2)(a)6. Thus, instead of requiring the jury to repeat in its own handwriting the only available aggravating circumstance, the judge submitted the following form verdict with respect to each count of the indictment:

> We the jury, by unanimous vote, find that the aggravating circumstance described in Instruction No. 10, "The defendant's act or acts of killing were intentional and resulted in multiple deaths" (CLEARLY CIRCLE ONE OF THE FOLLOWING):
>
> —HAS—
>
> —HAS NOT—
>
> been proven from the evidence beyond a reasonable doubt.

---

FOREPERSON

On each form, the jury circled the word "—HAS—" and the form was signed by the foreperson. Use of this form did not contravene the requirement that the jury "designate in writing, signed by the foreman of the jury, the aggravating circumstance or cir-cumstances which it found beyond a reasonable doubt." KRS 532.025(3).

*3. Appellant's absence during discussion of instructions.*

 Appellant complains that he was not present when court and counsel discussed the penalty phase instructions while the jury was deliberating on his guilt or innocence. Appellant did not object to these legal arguments being conducted outside his presence and such is generally regarded as a waiver. *Byrd v. Commonwealth*, Ky., 825 S.W.2d 272, 274 (1992). It is not reversible error to conduct legal arguments between court and counsel outside the presence of the defendant. *Parrish v. Commonwealth*, Ky., 472 S.W.2d 69, 71 (1971); *Thomas v. Commonwealth*, Ky., 437 S.W.2d 512 (1968), *cert. denied*, 397 U.S. 956, 90 S.Ct. 949, 25 L.Ed.2d 142 (1970). Since the jury was properly instructed at the penalty phase of this trial, Appellant could not have been prejudiced by the fact that the instructions were discussed outside his presence.

## IX. CLOSING ARGUMENTS

*1. Prosecution arguments.*

 We have reviewed the prosecutor's closing arguments at both the guilt and penalty phases of the trial and find Appellant's claims of improper argument to be both unpreserved and without merit. The prosecutor did not "shift the burden of proof" by arguing during the guilt phase that the defendant failed to rebut the Commonwealth's evidence. "A prosecutor may comment on tactics, may comment on evidence, and may comment as to the falsity of the defense position." *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 411–12 (1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989); *see also Bowling v. Commonwealth, supra*, 873 S.W.2d at 178–79 (1993); *Haynes v. Commonwealth*, Ky., 657 S.W.2d 948, 953 (1983). The prosecutor did not attempt to define "reasonable doubt" in contravention of *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391, 393 (1984). He simply argued that the evidence left no reasonable doubt of Appellant's guilt. Nor did the prosecutor's argument that Appellant had a mo-

tive to lie contravene the presumption of innocence. The prosecutor is entitled to attack a defendant's credibility if the defendant testifies as a witness on his own behalf. An accused who testifies on his own behalf is subject to the same rules as an ordinary witness. *Cf. Benge v. Commonwealth*, 265 Ky. 503, 97 S.W.2d 54 (1936).

 The prosecutor did not misstate evidence during his closing argument. The alleged misstatements are more accurately characterized as interpretations of the evidence. In his closing remarks, a prosecutor may draw all reasonable inferences from the evidence and propound his explanation of the evidence and why it supports a finding of guilt. *Bills v. Commonwealth*, Ky., 851 S.W.2d 466 (1993). The prosecutor's characterization of this double murder as the "worst imaginable crime" did not exceed the latitude normally afforded in closing argument. This was but a statement of opinion based on the prosecutor's view of the evidence. *Derossett v. Commonwealth*, Ky., 867 S.W.2d 195 (1993). The prosecutor did not degrade opposing counsel by referring to the defense team as "two tremendously skillful lawyers." Nor did he exceed the bounds of propriety by arguing that "the murder was well thought out and carefully executed with malice aforethought and no remorse." Again, this is but an opinion based on an interpretation of the evidence. A prosecutor is also entitled to argue that the defendant's mitigating evidence is entitled to little weight. *Sanborn v. Commonwealth*, Ky., 892 S.W.2d 542, 555 (1994), *cert. denied*, 516 U.S. 854, 116 S.Ct. 154, 133 L.Ed.2d 98 (1995). This argument did not violate the "presumption of innocence," because the presumption of innocence applies only to the guilt phase of a trial. *Delo v. Lashley*, 507 U.S. 272, 278–79, 113 S.Ct. 1222, 1226, 122 L.Ed.2d 620 (1993).

*2. Defense argument.*

 Appellant claims he was denied the right to counsel during penalty phase closing argument because his counsel essentially conceded his guilt:

The man with whom I have spent time for the last several months, the man for whom I have poured water and patted him on the arm and shook his hand and looked into his eyes for the past months, took two people into a farm in Washington County and he killed them.

This is the perfect example of lifting words out of context. Prior to making this statement, counsel began her closing argument by acknowledging the jury's verdict of guilt "with a sense of profound regret, but nonetheless profound acceptance." The balance of the argument was spent "humanizing" Appellant and pleading for mercy. An attempt to ingratiate a criminal jury by expressing respect for its guilty verdict in the hope of persuading it toward a more lenient sentence is a common strategy in penalty phase arguments. After all, to what avail would counsel continue to argue innocence to a jury which has just convicted her client of two brutal murders? We are unpersuaded that employment of this strategy divested Appellant of counsel during the penalty phase of his trial.

## X. TRIAL JUDGE'S REPORT

Upon the imposition of a death sentence, a trial judge is required by KRS 532.075(1) to submit a report in the form of a standard questionnaire containing certain factual data and identifying those factors warranting imposition of the death penalty and those weighing against it. Appellant complains of the contents of this report in the following respects: (1) listing lack of remorse and cold, unemotional attitude as nonstatutory aggravators; (2) failing to consider Buchanon's "deal" as a mitigator or to acknowledge the presence of residual doubt; (3) failing to consider Appellant's impairment from drugs or alcohol; (4) failing to consider specific nonstatutory mitigating factors, such as good work record, four years military service, college degree, good prison record, etc.; and (5) ungrounded finding that the victims had a good reputation in the community.

 Like a jury, the trial judge is entitled to weigh all of the factors which he is required to consider. The purpose of the report is to insure that the trial judge based his decision to impose the ultimate penalty on relevant factors supported by the evidence and his personal observations during

**40**

the course of the trial. In other words, its purpose is to provide further assurance that the death penalty was not arbitrarily or capriciously imposed. *Cf. Gregg v. Georgia*, 428 U.S. 153, 194–95, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976). Like a jury, the trial judge may give more weight to some factors than to others, and no weight at all to those which he believes are entitled to none. Specifically, he may consider a defendant's lack of remorse as a nonstatutory aggravator. *Matthews v. Commonwealth*, Ky., 709 S.W.2d 414, 422–23 (1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 245, 93 L.Ed.2d 170 (1990). He is not required to make specific findings with respect to each and every mitigating factor asserted by the defense. *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 306 (1997); *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 682 (1990), *cert. denied*, 502 U.S. 831, 112 S.Ct. 107, 116 L.Ed.2d 76 (1991). Finally, contrary to Appellant's assertion, there was evidence from the victims' parents sufficient to support a finding that the victims were persons of good reputation. The trial judge's report indicates that his decision to impose the death sentence was neither arbitrary nor capricious, but was based upon factors supported by the evidence and his personal observations made during the trial of this case.

## XI. MISCELLANEOUS ISSUES

### 1. Double jeopardy.

 Imposition of two death sentences by application of the same aggravating factor, *i.e.*, intentional acts of killing resulting in multiple deaths, did not violate the proscription against double jeopardy. U.S. Const., 5th Amend.; Ky. Const. § 13. Although the aggravating factor was the same, the facts necessary to prove it differed with respect to each victim. Appellant was sentenced to death for the intentional murder of Southerland aggravated by the fact that he also intentionally killed Maddox; and he was sentenced to death for the intentional murder of Maddox aggravated by the fact that he also intentionally killed Southerland. *Bowling v. Commonwealth, supra*, 873 S.W.2d at 181 (1993).

### 2. Cumulative error.

 This case was carefully and cleanly tried. Appellant received a fundamentally fair trial and there was insufficient harmless error to create a cumulative effect which would mandate reversal for a new trial. *Compare Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 483 (1993).

### 3. Residual doubt.

 Appellant argues that *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) requires that his sentence be reduced to less than death because of the existence of a "residual doubt" as to his guilt. In *Lockhart*, the defendant argued that a "death-qualified" jury violated his entitlement to an impartial jury during the guilt phase of his capital trial; thus, separate juries should have been impaneled for the guilt and penalty phases of his trial. The issue of "residual doubt" was addressed only in the Court's discussion of the state's argument that a unitary jury system permitted a defendant to benefit at the sentencing phase from any residual doubt the jury may have had about the evidence presented at the guilt phase. *Id.*, 476 U.S. at 181, 106 S.Ct. at 1769. As thus presented, the concept of "residual doubt" is akin to a lesser included version of jury nullification. It plays no role in jury instructions, *Bussell v. Commonwealth, supra*, or in appellate review.

### 4. Constitutionality of the death penalty.

 Imposition of the death penalty does not violate the constitutional proscription against cruel and unusual punishment. *Gregg v. Georgia, supra*, 428 U.S. at 179–87, 96 S.Ct. at 2928–32; *White v. Commonwealth*, Ky., 671 S.W.2d 241 (1984). Nor is its application arbitrary in view of the guidelines for its imposition provided by KRS 532.025 and KRS 532.075. *Perdue v. Commonwealth, supra*, at 168. Death by electrocution is not cruel and unusual punishment. *See McQueen v. Parker*, Ky., 950 S.W.2d 226 (1997) and cases cited therein. The aggravating factor of intentional killing resulting in multiple deaths sufficiently narrows the class of death-eligible persons to pass constitutional muster. *Arave v. Creech*, 507 U.S. 463, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993); *Low-*

enfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988); Zant v. Stephens, 462 U.S. 862, 874, 103 S.Ct. 2733, 2741, 77 L.Ed.2d 235 (1983).

## XII. KRS 532.075(3) REVIEW

 Pursuant to KRS 532.075(3), we have reviewed this record and determined that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the finding of the aggravating factor of intentional killing resulting in multiple deaths. We have also reviewed all cases decided since 1970 in which the death penalty was imposed. We have particularly considered those in which a defendant was sentenced to death for multiple intentional murders unaccompanied by other criminal behavior directed toward the victims, e.g., burglary, robbery, rape, etc., viz: Foley v. Commonwealth, Ky., 953 S.W.2d 924 (1997) (four murders); Foley v.. Commonwealth, supra, 942 S.W.2d 876 (two murders); Bowling v. Commonwealth, supra, 873 S.W.2d 175 (two murders); Smith v. Commonwealth, Ky., 734 S.W.2d 437 (1987) (four murders), cert. denied, 484 U.S. 1036, 108 S.Ct 762, 98 L.Ed.2d 778 (1988); Halvorsen and Willoughby v. Commonwealth, supra (two murders); Bevins v. Commonwealth, Ky., 712 S.W.2d 932 (1986) (five murders), cert. denied, 479 U.S. 1070, 107 S.Ct. 963, 93 L.Ed.2d 1010 (1987); Harper v. Commonwealth, Ky., 694 S.W.2d 665 (1985) (two murders), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); and Boyd v. Commonwealth, Ky., 550 S.W.2d 507 (1977) (two murders, but sentence reduced to life in prison due to the United States Supreme Court's decision in Gregg v. Georgia, supra ). On the basis of this review, we have determined that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crimes and the defendant.

For the reasons stated in this opinion, the judgments of conviction and sentences imposed by the Fayette Circuit Court are affirmed.

GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

STUMBO, J., dissents by separate opinion, with STEPHENS, C.J., and LAMBERT, J., joining that dissent.

STUMBO, Justice, dissenting.

Respectfully, I must dissent. I disagree with the majority on two issues in this case: VI. The Glidewell issue; and VII(4) The polygraph issue. In deciding to dissent, the argument of counsel before this Court kept replaying in my mind. As counsel so correctly reminded us, this case comes down to issues of witness veracity: who do you believe? Thus, Appellant's truthfulness and that of his former co-defendant, Buchanon, determined the outcome of this trial. I believe the errors committed in regard to those two pieces of testimony were of sufficient magnitude as to necessitate a new trial.

The latter error is the simplest to deal with. During his testimony, Buchanon was asked about an interview he underwent at the London State Police Post. Buchanon responded: "[T]his for a polygraph." Prior to the questioning, defense counsel had expressed his concern that the witness might refer to matters that were inadmissible and unresponsive to the questions posed. The Commonwealth immediately recognized that Buchanon's answer was not responsive, but objected to the motion for mistrial. While Buchanon's reference to a polygraph could be considered oblique, it must be considered in light of the circumstances of this trial. The Commonwealth's case relied very heavily on Buchanon—in fact, in opening statement, the Commonwealth's attorney informed the jury that "one question I will ask you now and one question I will ask you next week when we wrap this case up is 'would we be here if it wasn't for Bill Buchanon?'" Not only was Buchanon the only eyewitness to the crime, his testimony was crucial to the Commonwealth's case.

This Court has repeatedly cautioned against any reference to the polygraph examination of defendants. As we stated in Morton v. Commonwealth, Ky., 817 S.W.2d 218, 222 (1991):

We have noted that by its very nature, a polygraph examination has an enormous propensity to influence the jury and prohibited any mention of the taking of such an examination. (Citations omitted.) ... [We have] reversed [a] conviction because a police officer described as having "special interrogation skills" disclosed to the jury that the interrogation took place in a room in which was located a polygraph instrument.... [This disclosure] "amounted to a virtual banner headline" that appellant had been given a polygraph examination.

I would hold the mention of the polygraph by this witness could easily have allowed the jury to draw the clear inference that Buchanon had indeed taken a polygraph examination. The fact that the Commonwealth then decided to rely so heavily upon Buchanon logically leads one to conclude he passed the examination and is, therefore, reliable or truthful.

When this electronic vouching for a witness is combined with the error committed when Appellant was allowed to be cross-examined about what we have called the *Glidewell* issue, the prejudice to Appellant becomes clearer. Glidewell came on the scene after Appellant's first trial and testified on Appellant's behalf at Appellant's motion for new trial. He was named as a newly-discovered alibi witness who allegedly was with Appellant when the murders occurred. That story was proved false when the Commonwealth determined that Glidewell was in the Barren County jail on the day of the murders and could not have been in Indiana with Appellant as he had testified. Glidewell was convicted of perjury for his testimony.

During Appellant's second trial, the Commonwealth was permitted, over objection, to cross-examine Appellant about Glidewell's testimony, the false nature of that testimony, and Glidewell's perjury conviction. As noted in the majority opinion, we have always rejected the use of particular wrongful acts as a basis for the impeachment of a witness's credibility. While the particular provision of the KRE that forbade the use of such evidence did not survive the hands of the legislature, nothing in the KRE authorizes the approach. Our own Civil Rule 43.07 provides that a witness may not be impeached "by evidence of particular wrongful acts, except that it may be shown by the examination of a witness, or record of a judgment, that he has been convicted of a felony." The majority relies upon a quote from *Foley v. Commonwealth*, Ky., 942 S.W.2d 876, 887 (1996), wherein we stated generally that attempts to suppress testimony or to convince a witness to swear falsely are admissible as evidence tending to show guilt.

The facts and circumstances of the *Foley* case, however, were completely different than those in the instant case. In *Foley*, the person whom Foley allegedly intimidated in an attempt to get him to change his testimony actually testified at trial and accused Foley of intimidating him. Later, during his own testimony, Defendant Foley attacked the credibility of the complaining witness, and thus opened the door for the Commonwealth to cross-examine him regarding his involvement in attempting to convince that witness to testify falsely or not at all. In contrast, here Glidewell was not called to the stand, and so his veracity was in no way an issue in this trial. Further, at no time did the Commonwealth prove or even allege that Glidewell's perjured testimony was obtained by Appellant or at Appellant's instigation. The majority is allowing the jury to infer that fact based on the meager testimony of Appellant and the testimony of two other witnesses regarding Buchanon's guilt. While the Glidewell evidence may be relevant to prove the charge against Appellant, the circumstances of this case make it far more prejudicial than it would have been were there the slightest bit of physical evidence tying Appellant to these crimes.

As stated earlier in this opinion, this is the simplest and, at the same time, most difficult of criminal cases—a swearing contest. If you believe Buchanon, Appellant shot the victim. If you believe Appellant, Buchanon pulled the trigger. In this situation, even marginally relevant evidence is heightened in importance because the jury verdict depends not on concrete fact or physical evidence, but on the intangible factor of which witness seemed to be telling the truth. In affirming this conviction, the majority has cast to the

winds prior decisional law in two significant areas and has sent a man to his death by way of the casual mention of a polygraph and the criminal record of a non-witness.

STEPHENS, C.J., and LAMBERT, J., join.