CORRECTED: NOVEMBER 12, 2020
RENDERED: JULY 9, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0402-MR

TERRENCE DOWNS                                     APPELLANT

           ON APPEAL FROM JEFFERSON CIRCUIT COURT
V.            HONORABLE ANGELA MCCORMICK BISIG, JUDGE
           NOS. 16-CR-003370 & 18-CR-001693

COMMONWEALTH OF KENTUCKY                   APPELLEE

**OPINION OF THE COURT BY JUSTICE VANMETER**

**REVERSING AND REMANDING**

Terrence Downs appeals as a matter of right[1] from his twenty-five-year sentence for convictions of first-degree manslaughter, tampering with physical evidence, possession of a handgun by a convicted felon, and second-degree persistent felony offender (PFO2). Because Downs was deprived of his right to counsel at a critical stage of the proceedings, we reverse his convictions and remand for further proceedings consistent with this Opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

On Saturday, December 10, 2016, Downs shot and killed Ronnie Reed inside the kitchen of Brandy Taul's apartment, located in the Guardian Court

---

[1] Ky. Const. § 110(2)(b).

apartment complex in Louisville. Brandy, her roommate Juanita Downs,[2] and Juanita's sister Jordyn Hinkle, witnessed the shooting. The shooting occurred shortly after Jordyn telephoned Downs, who was a good friend of hers, and told him that she was upset because Reed had put his hands on her in the parking lot of the apartment complex where Jordyn also resided. At Jordyn's request, Downs drove over to her apartment to talk with her.[3]

Downs believed Jordyn but having known Reed since middle school, wanted to talk with him about what happened. Downs and Jordyn went to Brandy's apartment looking for Reed but he was not there. Downs spoke with the people there and tried to get a sense of what had happened. They informed Downs that Reed was on his way back to Brandy's apartment. At this point, Jordyn called Reed, and Downs spoke with him. Reed denied putting his hands on Jordyn and said he was coming over.

While they waited, Downs and Jordyn went to the store. Upon returning, they encountered Reed in the apartment parking lot. Downs saw Reed was holding a .45 handgun with an extended clip. Jordyn went upstairs to Brandy's apartment while Downs and Reed remained outside. Downs testified that Reed denied responsibility and became frustrated and wanted to talk to Jordyn. Reed headed upstairs to the apartment, Downs followed. Juanita, who watched their encounter from a window at the landing outside the

---

[2] No relation to Terrence Downs.

[3] Evidently, the conflict between Reed and Jordyn arose because Jordyn learned that Reed was also having an intimate relationship with her sister, Juanita.

2

apartment, testified that Downs and Reed spoke cordially, with no indication of a conflict.

In the apartment, Jordyn and Juanita were in the small kitchen, sitting on the countertop. Reed entered the kitchen first, with Downs behind him. At this point, the evidence is conflicting as to whether Reed was waving the handgun around with his hand on the trigger threatening people OR whether Reed simply set the gun on the counter and turned his back to it while civilly speaking with Juanita and Jordyn. Regardless, Downs grabbed the gun and struck Reed in the head with it from behind. Reed staggered, turned to face Downs, and Downs shot him. Downs then fled the scene; he testified that he dropped the gun in the parking lot as he ran away. Reed was taken to the hospital, where he died that morning. Downs was arrested two days later. The handgun was never found.

A grand jury indicted Downs for murder, robbery first-degree, possession of a handgun by a convicted felon, wanton endangerment first-degree, tampering with physical evidence, and PFO2. The trial court dismissed the robbery first-degree and wanton endangerment first-degree counts and severed the handgun-possession count. After the guilt phase of trial, a jury convicted Downs of manslaughter first-degree and tampering with physical evidence. At that point, the parties agreed to the disposition of the other offenses and the penalty. Downs pled guilty to possession of a handgun by a convicted felon, being a PFO2, and to the tampering with physical evidence charge for which he already had been convicted. Pursuant to the parties' agreement, Downs waived

sentencing and the trial court imposed twenty-five years' imprisonment with Downs reserving his right to appeal the manslaughter first-degree conviction.

## II. ANALYSIS.

### a. Downs was denied the right to counsel at a critical stage of the proceedings.

Downs claims he was denied the right to conflict-free counsel at a critical stage of the proceedings — during an in-chambers hearing the trial court conducted on the fitness and ability of his private attorney, Brendan McLeod, to try the case. Kentucky case law is settled that "a complete absence of counsel at a critical stage of a criminal proceeding is a *per se* Sixth Amendment violation warranting reversal of a conviction, a sentence, or both, as applicable, without analysis for prejudice or harmless error." *Allen v. Commonwealth*, 410 S.W.3d 125, 144 (Ky. 2013).

On the afternoon voir dire was scheduled to commence, the Commonwealth informed the court that it had an issue to address and asked to approach the bench. At the bench conference, Dorislee Gilbert, an appellate attorney with the Jefferson County Commonwealth's Attorney's office, entered a limited appearance to report concerns about the fitness of Downs's attorney, McLeod, to try the case. She told the court:

> Our point here, Judge, is not to accuse Mr. McLeod, or to say bad things about him. Honestly, if the things that I am hearing about him are true, I have concerns about him personally, but today the purpose of this hearing and the reason we're putting this stuff on the record, is because there is a man who is facing a prison sentence who has a Sixth Amendment right to effective counsel, and we are aware of something, and as prosecutors it is our obligation to help secure his rights.

4

Gilbert informed the court that she had witnesses, including potentially another Jefferson Circuit Court Judge, who would testify as to their concerns about McLeod's fitness to try the case. The trial judge said that Jefferson Circuit Court Judge Chauvin had already approached her out of court, off the record, expressing his observation that McLeod's thinking sounded circular or disjointed during a bond arraignment hearing earlier that day, but that he did not plan on reporting McLeod to a lawyer agency or anything of that nature. The trial judge stated that in observing McLeod that day, she had not perceived any physical manifestation of him being under the influence of anything. When the court indicated that it would hear from the Commonwealth's witnesses, McLeod requested that it do so in chambers.

Downs remained in the courtroom while the attorneys retreated to chambers. In chambers, the court heard from two assistant Commonwealth's Attorneys: Justin Janes, who had appeared in Judge Chauvin's courtroom with McLeod for a bond arraignment hearing earlier that day, and Scott Drabenstadt, who had interacted with McLeod in the hallway that day. Janes said that after sitting through the arraignment, he was concerned about McLeod's health and his ability to work, since McLeod did not seem like himself. After the arraignment, Judge Chauvin asked Janes if McLeod was going to try a case that day, then stated "that man should not be operating heavy machinery." Drabenstadt told the court that he was friends with McLeod, had known him for many years and had encountered McLeod in the hallway earlier, and that McLeod was not himself — he was not speaking or walking in his usual manner — and Drabenstadt wondered if something was

5

neurologically wrong with him like maybe he had suffered a stroke. The trial court commented that it had not seen anything inappropriate from McLeod since starting the case. The court then questioned McLeod, inquiring as to whether he was under the influence of any medication, or had a health issue, or a personal situation affecting him that would impair his ability to adequately represent Downs that day. McLeod said that nothing in his personal life affected his ability to try the case. He further denied having a health issue or being under the influence of medication, other than taking Sudafed for postnasal drip. He told the court he was "naturally hyper" but that he had stopped taking Valium a month ago. He pointed to the prosecutors' aggressive attitude toward Downs and confrontational proceedings as a source of agitation in this case. The trial court acknowledged that the case had been acrimonious.

The Commonwealth then asked the court to make a ruling on whether McLeod was fit to proceed that day. The Commonwealth further requested that in the event the court determined he was fit to proceed, the court advise Downs of the general concerns raised so that he would be aware and could raise any observations or concerns he had with McLeod's representation. McLeod protested on grounds that informing Downs of the allegations amounted to corroding his client.

The trial court ruled that McLeod was fit to proceed, finding as follows:

> To take the very serious step of saying that a lawyer is not fit to represent his client I believe that I would need more information than what has been presented to me. I haven't had anyone say that there's been any smell, I haven't seen any physical manifestation, like I said, I do not doubt, and I wholeheartedly believe these allegations are being made in good faith and are not being made for tactical advantage in this underlying case. I've been

6

on the bench 16 years and I've never had anyone raise an issue like this. I don't think the Commonwealth would start today just doing this to gain an advantage in this case. But I just don't see enough evidence to remove Mr. McLeod from representing his client.

While noting the importance of a defendant's right to counsel of his choice, the court refused to inform Downs of the issues raised and the court's ruling, stating that it had observed Downs and McLeod appropriately interacting throughout the proceeding and that Downs had not asked the court to intervene, or looked to the court as though there was a problem. The court believed that to question Downs about McLeod's fitness at this point would prejudice their relationship, which the court declined to do without more evidence of inappropriate behavior from McLeod. The court said that it would continue to monitor the situation.

McLeod asked to break for the day because he felt upset and under attack. The court dismissed the jury for the night. The next morning, McLeod was thirty minutes late to court and the trial court reprimanded him for his tardiness, informing him he would be fined every time he was late going forward. The court then addressed Downs in open court, checking in with him to make sure he wished to proceed with McLeod as his counsel, and that he was comfortable with McLeod as his counsel. Downs responded yes, and the court asked him if he had any questions. Downs said, "I mean I didn't really get the full extent of what was going on but he told me a little bit of it . . . I mean, I don't know." The court clarified that Downs was comfortable going forward with McLeod as his attorney, and that they were working together in his defense, and Downs said yes.

On appeal, Downs's DPA-appointed counsel argues that Downs had the right to be represented by conflict-free counsel and to have been present during the court's in-chambers hearing or, at the very least, should have been informed of the nature of the inquiry and the court's findings. RCr[4] 8.28(1) states, in part: "The defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence." Indeed, "[i]t is well-settled that a criminal defendant has a right to be represented by counsel that extends beyond the actual trial to every critical stage of the proceedings." *Allen*, 410 S.W.3d at 138 (citations omitted).

> [A]n analysis of a critical stage necessarily involves a retrospective inquiry as to the nature and consequences of each step in the proceedings. Particular attention must be given to how counsel would have benefited the defendant at these moments. A portion of a criminal proceeding is a critical stage if a reasonable likelihood exists that the defendant was prejudiced by the absence of counsel.

*Id.* at 139 (internal quotations and citations omitted).

Downs asserts that the in-chambers hearing on McLeod's fitness to try the case was a critical stage of the proceedings and that he was prejudiced by not having conflict-free counsel represent him. He points out that the hearing turned on contested facts, rather than mere legal arguments, which he distinguishes from situations involving only legal arguments between the court and counsel, or other minimal events for which the defendant's presence makes no difference. *See, e.g., Tamme v. Commonwealth*, 973 S.W.2d 13, 38

---

[4] Kentucky Rules of Criminal Procedure.

(Ky. 1998) (holding that the defendant's absence during discussion of jury instructions was not reversible error, as such discussion involved only legal arguments); *Parrish v. Commonwealth*, 472 S.W.2d 69, 71 (Ky. 1971) (holding that the defendant's absence from a pretrial motion for a continuance was not reversible error).

Downs emphasizes that no one in chambers was representing his interests: McLeod was acting as a fact witness for the subject matter of the hearing and not in his capacity as Downs's attorney. Downs argues that McLeod's objection to the court informing him of the inquiry reveals the inherent conflict: McLeod was seeking to preserve his attorney-client relationship with Downs, rather than serving as an advocate for Downs's interests. In support, Downs directs us to *Zapata v. Commonwealth*, wherein this Court held on direct appeal that the defendant was deprived of his right to conflict-free counsel during a critical stage in the proceedings when his counsel was placed in the untenable position of defending her own interests which were adverse to her client's. 516 S.W.3d 799, 803 (Ky. 2017). In *Zapata*, the defendant moved to withdraw his plea based on his counsel's alleged deception. The defendant's counsel admitted the motion put her in an "awkward position" and this Court agreed, holding that "to argue in favor of [her] client's motion would require admitting serious ethical violations and possibly subject [her] to liability for malpractice; on the other hand, any contention by counsel that defendant's allegations were not true would . . . contradict [her] client." *Id.* (citations omitted).

In response, the Commonwealth argues that the in-chambers hearing was a procedural conference unrelated to the issues at trial and therefore did not require Downs's presence. The Commonwealth cites no Kentucky cases in support of its argument and instead directs us to two cases from the Tenth and Eleventh Circuits in which the federal courts held that the defendant's presence was not required. In the first case, *United States v. Oles*, the Court ruled that the defendants had no right to be present at a pretrial hearing, held two weeks before the jury trial, during which prospective counsel declined to enter an appearance and the court thus denied the appointed counsel's motion to withdraw. 994 F.2d 1519, 1525 (10th Cir. 1993). Specifically, the *Oles* court held that "the preliminary hearing was not a critical stage of trial, but instead would more accurately be classified as an administrative conference unrelated to any issues at trial. . . . appellants failed to establish that their presence at this hearing would contribute to the fairness of the overall proceeding." *Id.* Downs distinguishes *Oles* on grounds that the pretrial proceeding in that case did not affect the overall fairness of the proceedings as it did here where the health and fitness of defense counsel was questioned as voir dire commenced.

In the second case, *United States v. Bowe*, the Court cited *Oles* in applying the principle that procedural conferences unrelated to the issues at trial do not require a defendant's presence. 221 F.3d 1183, 1189 (11th Cir. 2000); *see also Small v. Endicott,* 998 F.2d 411, 414–15 (7th Cir. 1993) (holding that defendant had no right to attend scheduling hearing where court made no adverse ruling). In *Bowe,* an attorney on the defense team was arrested prior to

10

trial and entered a drug rehabilitation program. *Id.* at 1188. Subsequently, the defense attorneys requested a continuance until that attorney completed rehab, which the trial court denied after holding a status conference. *Id.* The appellate court held that the defendant had no due process right to attend the status conference as it was not formal, the defendant's presence would not have contributed to the discussion, the defendant did not claim to have a more extensive knowledge of counsel's situation than those who attended, and the defendant's request for a continuance was communicated to the court through his attorneys. *Id.* at 1189. Downs distinguishes *Bowe,* as the unavailable attorney in that case was part of a defense *team, i.e.,* the client had two other attorneys well-versed in the case representing him, whereas McLeod was Downs's only attorney. Moreover, Downs points out that the conference in *Bowe* occurred at least a month before trial commenced, not the day of voir dire, and the court had record of the defendant's wishes as expressed in an affidavit from Bowe explaining that he knew about the attorney's arrest and rehabilitation and wanted a continuance so that attorney could remain part of his defense team. Unlike the defendant in *Bowe,* Downs had no notice of the concerns raised about McLeod's fitness to try the case, and his acquiescence to McLeod's continued representation of him was made without this available information.

As this Court has noted, what constitutes a "critical stage" for Sixth Amendment purposes includes those circumstances in which "the accused must find himself confronted, just as at trial, by the procedural system, or by his expert adversary, or by both." *Cain v. Abramson*, 220 S.W.3d 276, 280 (Ky.

11

2007) (internal quotations and citations omitted). In *Cain,* we held that "the psychiatric evaluation, ordered by the court upon notice by Cain of his intent to assert mental illness as a defense to the crimes he is charged with committing, is not a 'critical stage' in the procedural system giving rise to a constitutional necessity for the presence of counsel." *Id.* at 281. We reasoned that our holding "balance[ed] the constitutional rights of the accused to have counsel present at 'critical stages' of the procedural system and to be free from compulsion to incriminate himself with the right of the public to refute disingenuous or inadequate claims of mental disease." *Id.* at 282.

Here, the trial court's in-chambers hearing failed to include the person most affected by the issues raised — Downs — who was on trial for murder. Whether Downs had a fit attorney representing him at trial is of utmost importance to the fairness of his trial. While Downs himself was not placed in an adversarial situation without counsel, he was excluded from participating in the procedural system during a fact-based inquiry that bore directly on his counsel's physical and mental ability to represent him competently and effectively. At the very least, Downs should have been informed of the allegations against McLeod and given the opportunity to retain independent counsel to advocate his interests.

Put simply, Downs's right to conflict-free counsel outweighed McLeod's desire to keep his attorney-client relationship intact and outweighed any potential inconveniences suffered by delaying the trial to conduct a proper hearing on the issues raised. While we commend the trial court's effort to investigate the Commonwealth's concerns in a confidential and professional

12

manner, the court's decision not to inform Downs of the Commonwealth's allegations against McLeod and not offer him the opportunity to retain independent counsel to represent his interests was error of constitutional magnitude and his manslaughter conviction must be reversed. In addition, Downs' guilty pleas for possession of a handgun by a convicted felon, being a PFO2, and tampering with physical evidence were entered after the guilt phase of his trial, i.e. after he was denied counsel at a critical stage of the proceedings against him. Because the entry of a guilty plea is a critical stage of the proceedings, we reverse those convictions as well.

We will now address any remaining claims of error that may arise again on remand.

### b. First-Degree Manslaughter Instruction.

Downs asserts that the first-degree manslaughter instruction erroneously required the jury to find that he was acting under extreme emotional disturbance (EED). As this claim of error is unpreserved, it is subject to palpable error review only pursuant to RCr 10.26:

> A palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

"Palpable error relief is available under RCr 10.26 only upon a determination that manifest injustice has resulted from the error. 'Manifest injustice' is 'error [that] so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Davidson v. Commonwealth*, 548 S.W.3d 255, 261 (Ky. 2018) (quoting *Miller v.*

13

*Commonwealth,* 283 S.W.3d 690, 695 (Ky. 2009)).

The trial court instructed the jury on first-degree manslaughter as follows:

Manslaughter in the First Degree

If you did not find the Defendant guilty under Instruction 1 [Murder], you will find the Defendant, Terrence Downs, guilty of Manslaughter in the First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in Jefferson County on or about December 10, 2016, he killed Reed by shooting him; AND

(B) That in so doing:

(1)     He intended to cause the death of Ronnie Reed while acting under the influence of an extreme emotional disturbance as defined in Instruction No. 6; OR

(2)     He did not intend to kill Ronnie Reed but intended to cause serious physical injury to Ronnie Reed; AND

(C) That he was not privileged to act in self-protection, as set out in Instruction 1A.

The Commonwealth concedes that this instruction should not have required a finding that Downs acted under EED, but argues the error was not palpable. As we are reversing and remanding on other grounds, we need not address whether the error was palpable, but do direct the trial court on remand not to include EED as a requisite finding under this instruction unless the evidence supports such an instruction.

### c.  *Provocation and Initial Aggressor Qualifying Instructions.*

Downs argues that the trial court erred by providing the provocation and initial aggressor qualifying instructions as they were not supported by the

14

evidence. Downs objected to the inclusion of these instructions that the Commonwealth tendered during trial. The trial court noted his objection and said it would make a final ruling once all the proof was submitted. However, Downs did not renew his objection the next day and the trial court included these qualifying instructions that rendered the defense of self-protection unavailable if Downs provoked Reed or if Downs was the initial aggressor.

We review the trial court's decision to provide a jury instruction under an abuse of discretion standard:

> Under the familiar standard prescribed in *Commonwealth v. English,* 993 S.W.2d 941, 945 (Ky. 1999), a trial court abuses its discretion when its decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom. Because such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard.

*Sargent v. Shaffer,* 467 S.W.3d 198, 203 (Ky. 2015) (internal quotations and citations omitted).

The provocation and initial aggressor instructions immediately followed the self-protection instruction and read:

Provocation Qualification

> Provided, however, that if you believe from the evidence beyond a reasonable doubt that Terrence Downs provoked Ronnie Reed to use or attempt to use physical force upon him, then the defense of self-protection is not available to him.

Initial Aggressor Qualification

15

Provided, however, that if you believe from the evidence beyond a reasonable doubt that Terrence Downs was the initial aggressor, the defense of self-protection is not available to him unless:

(a) He did not initially intend to cause death or serious physical injury to Ronnie Reed and his initial physical force was not such that he thereby created and knew he was creating a substantial risk of death or serious physical injury to Ronnie Reed; AND

(b) The force returned or threatened by Ronnie Reed was such that Terrence Downs believed himself to be in imminent danger of death or serious physical injury.

The language in the trial court's initial aggressor instruction follows the wording of KRS[5] 503.060, which in relevant part sets out exceptions to selfdefense:

(3) The defendant was the initial aggressor, except that his use of physical force upon the other person under this circumstance is justifiable when:

(a) His initial physical force was nondeadly and the force returned by the other is such that he believes himself to be in imminent danger of death or serious physical injury

In applying KRS 503.060 to jury instructions concerning the right to use deadly physical force, we have made clear that there must be sufficient evidence in the record to substantiate the instruction:

The criterion is whether movant, in good faith, believed it was necessary to exercise extreme force in saving his own life. It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury.

---

[5] Kentucky Revised Statutes.

16

*Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980).

Downs argues that his initial request for Reed to come talk to him was insufficient to warrant the qualifying instructions and that Reed bringing a gun to the conversation was a "show of force" that precluded a finding that Downs provoked Reed or was the initial aggressor. However, Downs's and Reed's interaction was not limited to the parking lot; they also interacted in the apartment afterwards. Notably, the witnesses' testimony at trial was conflicting as to whether Reed brandished his gun when he entered Brandy's apartment, waving it around and pointing it at Downs, or whether he set the gun on the counter without making any threats and turned his back to it when Downs hit him from behind.

This evidence, while conflicting, supported the trial court's decision to instruct the jury on provocation and initial aggressor. The jury was charged with weighing conflicting evidence, assessing the credibility of the witnesses, and drawing a conclusion in the form of a verdict. *Clark v. Commonwealth*, 567 S.W.3d 565, 569–70 (Ky. 2019). The jury could have reasonably determined that Downs provoked Reed, or was the initial aggressor, when he picked up the gun and pistol-whipped Reed while Reed had his back to him. Therefore, the trial court did not abuse its discretion by instructing the jury on provocation and initial aggressor qualifications to self-defense.

### d. Language of Provocation Instruction.

Regarding the wording of the provocation instruction, Downs admits he did not preserve this issue for review and thus argues that the trial court

17

committed palpable error by instructing the jury on provocation without including intent, a necessary element of the instruction. The Commonwealth acknowledges that the instruction was erroneous in that "it lack[ed] the statutory element requiring the defendant to provoke the victim *with the intent to cause death or serious physical injury* to him." *Barker v. Commonwealth*, 341 S.W.3d 112, 114 (Ky. 2011); *see also* 1 Cooper & Cetrulo, *Kentucky Instructions to Juries*, § 11.12 (2018) (includes statutory element of intent to cause death or serious physical injury).

Review of jury instructions is a question of law, which we review *de novo*. *Maupin v. Tankersley*, 540 S.W.3d 357, 359 (Ky. 2018); *Sargent v. Shaffer*, 467 S.W.3d at 204. Erroneous instructions are presumed to be prejudicial. *McKinney v. Heisel*, 947 S.W.2d 32, 35 (Ky. 1997).

KRS 503.060(2), which addresses improper use of force in self-protection, provides in part: "Notwithstanding the provisions of KRS 503.050,[6] the use of physical force by a defendant upon another person is not justifiable when: (2) The defendant, **with the intention of causing death or serious physical injury to the other person**, provokes the use of physical force by such other person[.]" (emphasis added). Downs claims that the jury should have been instructed to find that he *intended* to cause the death or serious physical injury to Reed when he provoked Reed to use force against him. Downs is correct and on remand, the trial court shall include the necessary element of intent if the evidence supports an instruction on provocation.

---

[6] KRS 503.050 provides for self-defense: "Use of physical force in self-protection."

***e. Downs Waived His Right to Appeal the Tampering with Physical Evidence Conviction.***

Downs argues that the evidence was insufficient to support the tampering with physical evidence conviction. After the jury convicted him of first-degree manslaughter and tampering with physical evidence, Downs pled guilty to possession of a handgun by a convicted felon, PFO2, and tampering with physical evidence. Pursuant to the plea agreement, Downs reserved his right to appeal only the first-degree manslaughter conviction. Because he waived the right to appeal his conviction for tampering with physical evidence, we decline to review this claim of error. *See Commonwealth v. Reed*, 374 S.W.3d 298, 300 (Ky. 2012) ("[a]n unconditional guilty plea waives the right to appeal . . . a finding of guilt on the sufficiency of the evidence").

***f. Jordyn Hinkle's Prior Inconsistent Statement.***

Downs asserts that the trial court improperly allowed the Commonwealth to introduce a recorded phone call that occurred between Brandy and Jordyn nine days after the murder through the testimony of Brandy, rather than Jordyn. Because Downs did not present an evidentiary rule or basis for his objection below, just that "it's wrong, it's not allowed," the Commonwealth argues that this issue is unpreserved and should be reviewed for palpable error only.

KRE[7] 103(a)(1) provides for an appeal on admission of evidence only if a timely objection was made at trial, and only when such objection "state[s] the specific ground for objection, *if the specific ground was not apparent from the*

_____

[7] Kentucky Rules of Evidence.

*context[.]"* (emphasis added). While Downs timely objected to the recording coming in through Brandy, the record is void of any specific ground for his objection. That said, because the ground for objection was apparent from the context of counsel's discussion at the bench (that the recorded phone call should have been played when Jordyn denied it took place), we will consider the issue preserved and review whether the trial court abused its discretion by admitting the recording through Brandy. *Goodyear Tire & Rubber Co. v. Thompson,* 11 S.W.3d 575, 577 (Ky. 2000) (an appellate court reviews a trial court's evidentiary rulings for an abuse of discretion).

The record shows that the Commonwealth questioned Jordyn about whether she spoke on the phone with Brandy nine days after the murder, on December 19, 2016. Jordyn denied the phone conversation occurred and said, "if it was recorded, I'd like to hear it." Later, the Commonwealth recalled Brandy who testified that she had recorded the phone call with Jordyn on that day at a detective's request and that the recording was an accurate representation of their conversation. The recording was played for the jury. During the recording, two female voices (Brandy and Jordyn) discuss threats being made against them because of Reed's murder. The female voice identified as Jordyn stated that Downs and Reed had "squashed it in the parking lot" and that when Reed and Downs came up to the apartment, Reed was being nice to her when, suddenly, Downs shot him — and that it was Downs's fault.

The Commonwealth maintains that it properly recalled Brandy for the sole purpose of introducing a prior inconsistent statement of Jordyn, since

20

Jordyn testified inconsistent with that recording by denying ever speaking to Brandy on the phone on December 19, 2016.  The Commonwealth points out that the recorded phone call was in discovery so Downs was aware of its content.

Downs directs this Court to KRE 613 in support of his assertion that the Commonwealth should have played the recording after Jordyn testified — "if it was recorded, I'd like to hear it" — and allowed Jordyn the opportunity to refresh her recollection and explain herself.  KRE 613 provides:

> Examining witness concerning prior statement.  Before other evidence can be offered of the witness having made at another time a different statement, he must be inquired of concerning it, with the circumstances of time, place, and persons present, as correctly as the examining party can present them; and, if it be in writing, it must be shown to the witness, with opportunity to explain it.  The court may allow such evidence to be introduced when it is impossible to comply with this rule because of the absence at the trial or hearing of the witness sought to be contradicted, and when the court finds that the impeaching party has acted in good faith.

KRE 613(a).

The Commonwealth contends that Downs conflates KRE 613(a)'s foundation requirement for introduction of a prior inconsistent statement with memory refreshment under KRE 612 and with the KRE 803(a) hearsay exception for introduction of a recorded recollection concerning a matter about which the witness once had knowledge.  Under KRE 801A(a)(1), relating to prior statements of witnesses, "[a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the declarant testifies at the trial or hearing and is examined concerning the statement, with a foundation laid as required by KRE 613, and the statement is . . .

21

[i]nconsistent with the declarant's testimony[.]" An inconsistent statement for purposes of KRE 801A(a)(1) includes a witness's claimed inability to recall making the statement. *McAtee v. Commonwealth*, 413 S.W.3d 608, 618 (Ky. 2013). And under Kentucky law, "prior inconsistent statements may be introduced as an impeachment device *and* as substantive evidence." *Id.*

Here, the Commonwealth established a foundation through Jordyn's testimony, then applied KRE 801A(a)(1) and KRE 613 in introducing her prior statements by way of playing the recorded phone call. The recorded phone call was sufficiently authenticated for its introduction into evidence by Brandy's identification of it as a phone call between her and Jordyn on December 19, 2016 and representation that the recording was an accurate reproduction of their conversation. Because Brandy authenticated the recording, it was properly admitted as a prior inconsistent statement of Jordyn pursuant to KRE 801A(a)(1). The Commonwealth need not have refreshed Jordyn's recollection with it first. *See King v. Commonwealth*, 554 S.W.3d 343, 360 (Ky. 2018) ("KRE 613 requires a written statement be shown to the witness; it does not address a recorded statement[]"). Thus, the trial court did not abuse its discretion by allowing the Commonwealth to introduce the recorded phone call through Brandy. That said, given that Jordyn now knows of the recorded phone call, we doubt this issue will arise again on remand.

### III. CONCLUSION.

Because Downs was deprived of his right to counsel at a critical stage of the proceedings, we reverse his judgment of **convictions** and

22

corresponding **sentences** and remand this case to the trial court for further proceedings consistent with this Opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Molly Mattingly
Assistant Public Advocate
Department of Public Advocacy


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General

Todd Dryden Ferguson
Assistant Attorney General