RENDERED:  JUNE 12, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0236-MR

TRISTIAN LONG　　　　　　　　　　　　　　　　　　APPELLANT


　　　　　　　APPEAL FROM BALLARD CIRCUIT COURT
v.　　　　　HONORABLE TIMOTHY A. LANGFORD, JUDGE
　　　　　　　ACTION NO. 24-CR-00088


COMMONWEALTH OF KENTUCKY　　　　　　　　　　　APPELLEE


OPINION
AFFIRMING IN PART,
VACATING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  ACREE, EASTON, AND TAYLOR, JUDGES.

TAYLOR, JUDGE:  Tristian Long brings this appeal from a December 20, 2024,

Judgment & Sentence on Pleas of Not Guilty entered by the Ballard Circuit Court,

sentencing Long to seventeen-years' imprisonment.  We affirm in part, vacate in

part, and remand.

# BACKGROUND

On July 19, 2024, the Commonwealth of Kentucky indicted Long upon the offenses of unlawful transaction with a minor (C.H.) in the first degree, distribution of obscene matter, and with being a second-degree persistent felony offender. The indictment stemmed from Long's interaction with C.H., who was thirteen years old. Long was married to C.H.'s cousin, and they had young children. C.H. and her minor sister, A.H., would babysit for Long and their cousin.

On June 25, 2024, Long initiated text messages to C.H., which were sexually explicit and contained photographs of Long's penis. The text messages with C.H. read, in relevant part:

> Long: You up?
>
> Long: You have plans for this coming weekend?
>
> C.H.: I don't think so y
>
> Long: Cortney works Friday Saturday and Sunday was gunna see if you wanted to come help babysit while I move and pack stuff.
>
> C.H.: Um maybe I will have to see if I can
>
> Long: Well I didn't run the idea by Cortney yet so if you wanna go about it another way that would be better. Like message [Long's daughter's] iPad sometime today and ask if she would wanna hang out this weekend then she can ask her mom and I'll tell her it's a good idea. Because if you ask then Cortney is gunna think something is up because I didn't say anything to her and I just asked you about it at 3 in the morning lmfao

-2-

C.H.:  Ya sure I can try to do that

Long:  That'd be cool!  Hopefully it works but there's no reason it shouldn't

C.H.:  Ya hopefully

Long:  I'm glad you hope so to

C.H.:  What is her i-pad number

Long:  [Long's daughter's email address]

Long:  If you aren't saved on her iPad just say you got it from [A.H.] or something but I thought y'all were all in there

C.H.:  Idk if I am or not I don't really save numbers

Long:  I understand that haha I save the ones I need to remember and that's it

C.H.:  Ya same

Long:  Is mine saved?? Lmao

C.H.:  Ya lol

Long:  As what? lol

C.H.:  Just ur name lol

Long:  Okay lol well if it's saved definitely make sure our messages get deleted lol

C.H.:  Ya lol

Long:  Just saying lol

C.H.:  Wyd

Long:  On my way to work and picturing the weekend if you get to come over lol what about you

C.H.:  Not sleeping

Long:  I mean you're replying to me so I kinda figured that lmao

C.H.:  Ya well that's really all I'm doing besides texting u back lol

Long:  But why lmfao you gotta do something other than just lay there awake lol

C.H.:  There is like nothing to do I'm jus bored

Long:  Touch yourself or something lmfao hell idk

Long:  That's what most people do she. They're up by themselves with nothing to do lmfao

Long:  If they don't go for just you coming they might go for it if you have a sibling either you and we could still do whatever if that's the case but I'm not worried about that I'm sure you can come.

C.H.:  Ya me too

Long:  She goes in to work at 7 so she leaves the house like 6.  When she does you're coming in the room with me?  Lol

C.H.  Ok

Long:  At least that's what came to my mind lol I don't know if it crossed yours

C.H.:  Ya lol

Long:  Okay good haha

-4-

C.H.: lol

Long: What lol

C.H.: Nothing

Long: Suuurreee lol we'll see about that

C.H.: Ok lol

Long: I'm looking forward to it! If for some reason someone doesn't go for it which sibling would you want to come with? [A.H.] or [the brother to C.H. and A.H.]?

C.H.: Um idk maybe [the brother]

Long: Just trying to come up with the plan b just in case

Long: Okay either one is fine I just wanted to know what you thought

C.H: Ok. Im gts

Long: Alright I hope you sleep good!

Record at 62-67. At the end of the text messages, Long included photographs of himself in the bathroom holding a towel, and in two photographs, Long's penis was exposed and visible.

C.H.'s father discovered the text messages between Long and C.H. and also discovered that sexually explicit text messages had been sent by Long to A.H., who was twelve years old. Apparently, Long initiated the sexually explicit text messages to A.H., on June 17, 2024. These text messages read, in relevant part:

Long:  You up?

A.H.:  yea

Long:  I gotta ask you a couple things but it can't go anywhere when I do

Long:  Like no one needs to know what I'm gunna ask I'm just trying to figure out something

A.H.: okay

Long:  You can be honest with me I won't tell anybody and delete this after we talk?

A.H.:  okay

Long:  Did you lose your virginity recently?

A.H.:  why are you asking me this

A.H.:  but no I didn't

Long:  Because I over heard some bs and I wanted to know what's what.  And alright good, did you or have you done anything else?

A.H.: no why bs did you hear

A.H.:  what*

Long:  Sorry if this is random af but I gotta know and it won't go anywhere

Long:  I'll talk to you more in a little bit when I'm headed to work in like 30 minutes
A.H.: okay

Long:  Anyone around you or can I call?  If I can't call it's cool

A.H.:  can you js text i am otp with my friends

A.H.:  srryyyy

Long:  And you know I'm not asking to try and get you in trouble or anything right?  Actually the opposite

Long:  Believe it or not lol

A.H.:  lol

Long:  You probably don't believe me huh

A.H.:  naw I believe

Long:  Alright cool, so you're telling me if you had done something you would trust me enough to tell me?

A.H.:  yep

Long:  Ah shit really?  I must be special

A.H.:  lol

A.H.:  why are you asking me this stuff tho lmao

Long:  You can say literally anything and it would stay between us fr I got you.  And I'm trying to look out for you if it's not true and if it was true then I was gunna keep it to myself lol

Long:  And there[']s a couple answer to that I guess

A.H.:  lol ik

A.H.:  lol what did you think I was saying

Long:  I definitely would though but what makes you comfortable with me asking and keeping our

conversation between us?  Just curious and you really want me to answer that?  Lmfao

A.H.:  yes I want you to answer that

Long:  I definitely would though but what makes you comfortable with me asking and keeping our conversation between us?  Just curious and y…

A.H.:  i dk lol

Long:  Before I answer that honestly I need you to answer something for me lol

A.H.:  okay

A.H.:  no I'm haven't I have only thought of you in like and uncle position

A.H.:  lol ik

Long:  Alright I just had to ask because when you said this I was thinking you were only replying to the part where I said there's a couple different answers to that lmfao and that made me think something else

A.H.:  no I'm haven't I have only thought of you in like and uncle position

Long:  And don't let my facial hair fool you I have pictures that you wouldn't believe it's me

Long:  So you have never done anything sexual?  If so just tell me but if not I have a dude I'm gunna shut up running his mouth

A.H.:  no I haven't I am 12 bor but who is it

Long:  That doesn't mean must fr that's when people used to start having babies fr my grandma had my dad at

12 and mamaw started having kids at that age lol hell when I was 19 a girl that age lied to me about her age and I fr that she was older and she got like 9 guys the same way.  She was already trying to do it with everyone at that age lol and so not say anything if I tell you

A.H.:  okay

Long:  So I heard you may have done something with Charles.  Something as in f**k.  And if y'all didn't that means the only place that bs would come from is him telling someone that and if that's what's going on I'm gunna politely put a stop so don't worry about saying anything

A.H.:  welp me nd hum [might] have but please tell me who is syaing this stuff

Long:  You could've just to me from the jump girl.  I'm on your side.  I won't tell anyone you can be open either me.  So y'all did have sex?  And I'll tell you but if I'm gunna be honest and open with you then you gotta do the same back and if you don't think you can trust me just tell me and I'll do something to show you that you can

A.H.:  I can trust you and yes we did

Long:  Now that I know for sure I can do my best to try to keep everyone out of your business but he isn't doing that.  He's already been telling people.  Heads up if you don't want everyone to know more than they already think they know don't message him about him telling people it will just be more for him to show his friends or brag to someone with.  He may be your friend but he's still gunna see it as a trophy and try to brag about it.  And if you don't want it getting out just deny it anytime its ever said especially if it's him saying it to you that way people will think maybe he's just making things up
Long:  Might sound crazy but trust me on this.

Long: I kinda knew it though when I seen you at Ashley's then at church

Long: I could see it in your eyes

Long: My next question. Does he have nudes of you?

(1 Reply – But not included)

Long: Okay that a plus. You might already know but if you ever send anything like that do it where they can't save it without you knowing.

A.H.: yea ik

Long: Oh do you?!

Long: Wanna know something I almost did on accident not long ago? Lol

A.H.: yes

Long: I went to send one and I damn near sent it to you on accident. I actually sent it but I didn't have service so it didn't go through and before you picture it or think about it I look much different sexually than you see me all the time.

Long: I can't believe I actually told you about that just now delete this conversation as we go please

A.H.: okay lmao thats crazy

Long: I'm not shy about what I look like if you seen it you'd see why I guess lol and yeah it is crazy but I felt I needed to share something no one else knows since you did lol

A.H.: lol

Long:  What lol

Long:  What about him haha

A.H.:  nothing lol I was making fun of him cuh he ugky as hell

Long:  oh wow lmfao

Long:  I can't believe what I just told you a minute ago

Long:  Or it went over your head and you didn't get it lol

A.H.:  lmao me nether

Long:  I have more questions though lmfao

A.H.:  okay lmao

Long:  And ask me some back bruh lmfao but do you have a gag reflex or do you know?

A.H.:  wtf

Long:  I told you I had more questions lmfao what did you expect me to ask after the rest of our conversation

A.H.:  idk but that's weird

Long:  No one has access to your phone messages or snap or anything right?  And that's literally no weirder than the rest of the conversation lmfao you openly told me about you having sex

Long:  I just had to ask
A.H.:  no nobody does and yeah I did bc some one had alr told you bro

A.H.:  are you under the influence??

Long:  True lol and I had some earlier why

A.H.:  I would cry

Long:  Why?

Long:  I don't wna see you naky

Long:  Well I know that but it wouldn't have made you cry lmfao

Long:  So you've only had sex?  Nothing else sexual? You skipped everything else?  Lol

A.H.:  yeah

Long:  That's wild fr lol  I mean when I lost mine I did other stuff right before well she did mostly but still.  I'm surprised he didn't ask for something else first

A.H.:  lmao

Long:  Most guys want head and stuff first that's why I said that

A.H.:  Oh lmao no he didn't

Long:  I don't feel like I can speak freely right now and I want to

A.H.:  lol

Long:  How is that funny lmfao

A.H.:  idk
Long:  You wouldn't know what to think of I knew I could talk openly

Long:  Thank you haha and if I can't speak freely why you gunna send me something like that after what I was

just saying and if you don't understand what I'm saying I'll gladly explain

A.H.: I don't know what u saying bruh

Long: So you want me to explain?

A.H.: idrc

Long: Alright well I was saying earlier I was surprised he didn't want head first because of your lips you have nice lips and your eyes when you look someone in their eyes is different than a lot of people so I thought it was crazy he didn't want that

A.H.: oh lol

Long: That's me being somewhat open but you haven't made it clear if I can be that open, you can't view me as an uncle in this conversation right now

A.H.: oh lmao

Long: Feel free to say what your actually thinking

A.H.: ok lmao

Record at 70-86. The father contacted the police, and Long was eventually indicted upon the above offenses stemming from his conduct with C.H.

Long was tried before a jury on November 12, 2024. Before submitting the case to the jury, the circuit court permitted the Commonwealth to amend the indictment to charge attempt to commit unlawful transaction with a minor (C.H.) in the first degree. The jury ultimately found Long guilty of attempt to commit unlawful transaction with a minor (C.H.) in the first degree, distribution

-13-

of obscene matter, and with being a persistent felony offender in the second degree. The jury recommended a sentence of seventeen-years in prison. In the court's December 20, 2024, Judgment and Sentence on Pleas of Not Guilty (Judgment), the circuit court sentenced Long to a total of seventeen-years' imprisonment. This appeal follows.

## ANALYSIS

Long raises four primary issues on appeal. Long asserts the trial court erred: 1) when the court failed to grant a directed verdict and allowed the Commonwealth to amend the indictment after the prosecution presented their case; 2) when the court allowed the admission of text messages between Long and A.H. in contravention of Kentucky Rules of Evidence (KRE) 404; 3) when the court allowed the admission of A.H.'s victim impact statement before sentencing; and 4) by the court's improper assessment of jail fees for Long's incarceration in the McCracken County jail prior to sentencing.

We will address each of these issues in the order presented in appellant's brief, including the appropriate standard of review.

## DIRECTED VERDICT-AMENDMENT OF INDICTMENT

Long contends the circuit court erred by not granting his motion for a directed verdict upon the charge of unlawful transaction with a minor in the first degree. Long maintains the circuit court improperly permitted the amendment of

the indictment to charge Long with attempt to commit unlawful transaction with a minor in the first degree. Long points out that he moved for a directed verdict after the Commonwealth rested its case, and the circuit court denied the motion. Long then elected not to call any witnesses in his defense, rested, and renewed his motion for a directed verdict upon the charge of unlawful transaction with a minor. According to Long, the circuit court concluded that the Commonwealth failed to prove that a sexual act occurred as required by Kentucky Revised Statutes (KRS) 530.064(1)(a) to convict Long of unlawful transaction with a minor. While the circuit court recognized that the Commonwealth failed to introduce any evidence of a sexual act, Long claims that the circuit court improperly permitted the Commonwealth to amend the indictment to charge criminal attempt to commit unlawful transaction with a minor. Long maintains that the circuit court essentially granted the directed verdict when the court concluded that evidence of a sexual activity was not introduced which was required for conviction. Consequently, Long argues the circuit court erred by permitting the amendment of the indictment after essentially granting a directed verdict upon the underlying charge. Additionally, Long asserts that he was prejudiced by the amendment as it was only granted after proof in the case had closed and ultimately "impacted how he presented his case." Long's Brief at 16.

The offense of unlawful transaction with a minor is codified in KRS 530.064 and provides, in part:

> (1) A person is guilty of unlawful transaction with a minor in the first degree when he or she knowingly induces, assists, or causes a minor to engage in:
>
> (a) Illegal sexual activity[.]

Criminal attempt is set forth in KRS 506.010(1) as follows:

> (1) A person is guilty of criminal attempt to commit a crime when, acting with the kind of culpability otherwise required for commission of the crime, he or she:
>
> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he or she believes them to be; or
>
> (b) Intentionally does or omits to do anything which, under the circumstances as he or she believes them to be, is a substantial step in a course of conduct planned to culminate in his commission of the crime.

And the Rules of Criminal Procedure (RCr) 6.16 permits the court to amend an indictment:

> The court may permit an indictment, information, complaint or citation to be amended any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced. If justice requires, however, the court shall grant the defendant a continuance when such an amendment is permitted.

Under RCr 6.16, a court may allow the amendment of an indictment before a jury verdict if "no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." Upon appellate review, the circuit court's decision to amend an indictment will be set aside only if it constitutes an abuse of discretion. *Bartley v. Commonwealth*, 485 S.W.3d 335, 342 (Ky. 2016).

In the case *sub judice*, the circuit court concluded that it was incumbent upon the Commonwealth to introduce evidence demonstrating that sexual activity occurred with C.H. in order to convict Long of unlawful transaction with a minor under KRS 530.064(1)(a). During the trial, the court stated there was no evidence that C.H. actually touched herself when Long encouraged her to do so. In fact, the court indicated there was no evidence demonstrating illegal sexual activity occurred with C.H. Instead of granting a directed verdict, the circuit court permitted the Commonwealth to amend the indictment and charge Long with criminal attempt to commit unlawful transaction with a minor in the first degree. The court believed the amendment conformed to the evidence introduced at trial and rendered the motion for directed verdict moot.[1]

---

[1] By separate written order entered November 12, 2024, the trial court clarified its rulings, stating that the Commonwealth's motion to amend the indictment was sustained and that Tristian Long's motion for directed verdict was rendered moot by virtue of sustaining the amended indictment motion. Record at 102.

-17-

This case is remarkably similar to *Justice v. Commonwealth*, 636 S.W.3d 407 (Ky. 2021), *abrogated on other grounds by Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022). Therein, the defendant was indicted upon the offense of rape. After the Commonwealth's case-in-chief, defendant moved for a directed verdict upon the rape charge. The circuit court concluded that the Commonwealth did not present sufficient evidence to convict defendant of rape, and "the Commonwealth will not be able [to] go forward on that charge." *Justice*, 636 S.W.3d at 411. Thereupon, the Commonwealth moved to amend the indictment to charge attempted rape. The circuit court granted the Commonwealth's motion and amended the indictment to charge attempted rape as it conformed to the evidence presented at trial. The jury convicted defendant of attempted rape. The Supreme Court recognized that the circuit court erred by not withdrawing the directed verdict and then granting the motion to amend the charge to attempted rape. However, the Court viewed any error as harmless because defendant "suffered no prejudice by defending against a lesser-included offense of the originally indicted charge." *Id.* at 412.

As in *Justice*, the amendment of the indictment to charge Long with criminal attempt to commit unlawful transaction with a minor conformed to the evidence presented at trial. *See Justice*, 636 S.W.3d at 412; *see also Alderson v. Commonwealth*, 670 S.W.3d 884, 896 (Ky. 2023). We note that no new evidence

-18-

was submitted at trial to support the amended charge, and Long offered no defense of any kind to the jury. The trial court's written order entered on November 12, 2024, reflects that the court did not rule on Long's directed verdict motion. To the extent the court committed any error regarding the motion for directed verdict, said error would be harmless as no prejudice resulted to Long. *See Justice*, 636 S.W.3d at 412; *Alderson*, 670 S.W.3d at 896. Thus, the court did not err in allowing the indictment to be amended based upon the evidence permitted at trial.

## ADMISSION OF TEXT MESSAGES

Long asserts that the circuit court committed reversible error by admitting into evidence text messages between A.H.[2] and Long. Long specifically contends that the Commonwealth failed to give notice of its intent to offer the text messages between A.H. and himself into evidence. As a result, Long asserts the notice provision of KRE 404(c) was violated, and the text messages were inadmissible. Long further argues the text messages with A.H. constitute prior bad acts and were inadmissible under KRE 404(b). In particular, Long maintains that the text messages did not prove any element of the charged offenses and were admitted solely for "distasteful and inappropriate conversation with A.H. meant that [Long] must have acted inappropriately on another occasion." Long's Brief at 30. Long maintains the text messages were highly prejudicial "as they depict him

---

[2] As pointed out earlier in this Opinion, A.H. is the sister of C.H.

-19-

as a man with a propensity to be inappropriate with minors." Long's Brief at 30. Consequently, Long believes the text messages were also inadmissible per KRE 404(b).

## 1. Notice

Under KRE 404(c), the Commonwealth is required to "give reasonable pretrial notice to the defendant of its intention to offer such evidence" of prior bad acts. The purpose of KRE 404(c) is "to provide the accused with an opportunity to challenge the admissibility of this evidence through a motion *in limine* and to deal with reliability and prejudice problems at trial." *Tamme v. Commonwealth*, 973 S.W.2d 13, 31 (Ky. 1998) (quoting *Lawson, The Kentucky Evidence Law Handbook*, § 2.25, p. 106 (3rd ed., Michie, 1993)). This issue was not preserved for appellate review; thus, our review proceeds under the palpable error rule set forth in KRE 103(e):

> Palpable error. A palpable error in applying the
> Kentucky Rules of Evidence which affects the substantial
> rights of a party may be considered by a trial court on
> motion for a new trial or by an appellate court on appeal,
> even though insufficiently raised or preserved for review,
> and appropriate relief may be granted upon a
> determination that manifest injustice has resulted from
> the error.

To demonstrate manifest injustice, there must exist a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006); *see also*

-20-

*Dixon v. Commonwealth*, 718 S.W.3d 408, 412 (Ky. App. 2025). Stated differently, "[a] palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings." *Howard v. Commonwealth*, 595 S.W.3d 462, 476 (Ky. 2020).

In this case, the record reflects that Long not only had actual notice of the text messages with A.H. but filed a motion *in limine* concerning the text messages with A.H. In the motion, Long maintained that Deputy James Campbell viewed A.H.'s phone and read the text messages with Long. In his motion, Long argued that any testimony of Deputy Campbell concerning the content of the text messages was inadmissible hearsay. Additionally, Long asserted that such evidence "would need to be solicited from [the children's father], the 12 year old, or the 13 year old, not Dep. Campbell." Record at 42. As previously set forth, the purpose of the notice requirement in KRE 404(c) is to provide the defendant with an opportunity to file a motion *in limine* challenging the admissibility of prior bad acts. Here, Long certainly had notice of the prior bad act evidence (text messages with A.H.) and filed a motion *in limine* suggesting the text messages could be admissible if presented though A.H.'s testimony. Considering these unique facts, we conclude that no palpable error occurred resulting in manifest injustice. *See* KRE 103(e); *Tamme*, 973 S.W.2d at 31.

-21-

## 2. Admissibility

KRE 404(b) generally prohibits introduction of evidence concerning other wrongs, acts, or crimes to prove a defendant's character or propensity to act in conformity therewith except:

>   (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
>   (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

To determine if evidence is admissible under KRE 404(b), "the trial court should use a three-prong test: (1) Is the evidence relevant? (2) Does it have probative value? (3) Is its probative value substantially outweighed by its prejudicial effect?" *Leach v. Commonwealth,* 571 S.W.3d 550, 554 (Ky. 2019). This issue is also unpreserved, so again our review is under the palpable error rule of KRE 103(e).

The text messages to A.H. were properly admitted under KRE 404(b) as the messages were relevant and probative concerning Long's intent, absence of mistake, and plan. The text messages to A.H. were initiated by Long, only eight days before he initiated the text messages to C.H. A.H. and C.H. were sisters, with one year difference in age (twelve years old and thirteen years old, respectively).

Both girls were related to Long's wife. The text messages to both girls were sexually explicit and exhibited Long's grooming behavior towards the girls. In particular, the text messages to A.H. demonstrated Long' s intent to send sexually explicit messages, a plan to send the messages to the minor sisters, his sexual interest in minor girls, and a lack of mistake. *See Hernandez v. Commonwealth*, 671 S.W.3d 217, 227-28 (Ky. 2023). While the admission of the text messages to A.H. may have been potentially prejudicial, we believe the probative value of the messages far outweighed any possible prejudicial effect. *See Hernandez*, 671 S.W.3d at 228. Hence, we conclude the circuit court did not err by admitting into evidence the text messages with A.H. under KRE 404(b)(1). Moreover, even if the circuit court had erred in admitting the text messages with A.H., there was overwhelming evidence of Long's guilt, and the error would not have resulted in manifest injustice. KRE 103(e); *Sexton v. Commonwealth*, 647 S.W.3d 227, 232 (Ky. 2022).

## A.H. VICTIM IMPACT STATEMENT

Long maintains the circuit court erred by allowing A.H. to make a victim impact statement to the circuit court before sentencing Long. Long points out that A.H. was not a victim of the offenses charged; rather, C. H. was the only victim entitled to make a victim impact statement. Nonetheless, Long asserts the circuit court permitted A.H.'s victim impact statement to be read at sentencing, and

Long claims that A.H.'s statement was filled with anger, intentionally cruel, and contained scathing remarks.[3] Long cites to A.H.'s comments that Long "should die in prison," was a "nasty pedophile," and was "a monster" who "ruined her life." Long's Brief at 31-32. Long surmises that A.H. "was successful in impacting the court with her testimony because the court described the letters as 'Jekyll and Hyde kind of activity' when comparing the character support letters from . . . [Long's] friends with A H.'s letter." Long's Brief at 34. Long acknowledges that this issue is also unpreserved and requests review for palpable error per RCr 10.26.

KRS 421.520 permits victim impact statements to be included in the presentence investigation report and considered by the court before sentencing a defendant. It reads:

> (1) The attorney for the Commonwealth shall notify the victim that, upon conviction of the defendant, the victim has the right to submit a written victim impact statement to the probation officer responsible for preparing the presentence investigation report for inclusion in the report or to the court should such a report be waived by the defendant.

> (2) The impact statement may contain, but need not be limited to, a description of the nature and extent of any physical, psychological, or financial harm suffered by the victim, the victim's need for restitution and whether the victim has applied for or received

---

[3] The mother of A.H. actually read the victim impact statement to the circuit court that was written by A.H.

-24-

compensation for financial loss, and the victim's recommendation for an appropriate sentence.

(3) The victim impact statement shall be considered by the court prior to any decision on the sentencing or release, including shock probation, of the defendant.

The term "victim" is defined in KRS 421.500, in part, as follows:

(1)(a) As used in KRS 421.500 to 421.575, "victim" means an individual directly and proximately harmed as a result of:

1. The commission of a crime classified as a felony; a misdemeanor involving threatened or actual physical injury, harassment, or restraint; a misdemeanor involving a child or incompetent person; or a misdemeanor involving a sexual offense or a trespass; or

2. Conduct which, if committed by an adult, would be classified as a felony or a misdemeanor described in subparagraph 1. of this paragraph.

If the victim is a minor, incapacitated, or deceased, "victim" also means one (1) or more of the victim's spouse, parents, siblings, children, or other lawful representatives which shall be designated by the court unless the person is the defendant or a person the court finds would not act in the best interests of the victim.

It has been recognized that the circuit court has "discretion to consider other impact statements from other individuals affected by the crime." *Sherroan v. Commonwealth*, 142 S.W.3d 7, 24 (Ky. 2004).

The record reveals that A.H.'s impact statement was read by her mother to the circuit court at the sentencing hearing. We emphasize that her impact statement was not read to the jury during the penalty phase of the trial. Accordingly, it was within the circuit court's discretion to permit A.H., as an individual affected by the crime, to give an impact statement to the court during the sentencing hearing. *See Sherroan*, 142 S.W.3d at 24. While portions of A.H.'s impact statement may have been irregular, we cannot conclude that the error was prejudicial or rose to the level of manifest injustice. The circuit court, as opposed to the jury, considered A.H.'s impact statement, and contrary to Long's contention, there is no indication that the circuit court was improperly swayed by A.H.'s impact statement.[4] Considering the overwhelming evidence of guilt and the particulars of Long's criminal conduct as to C.H., the circuit court's sentence of seventeen-years' imprisonment was reasonable and was consistent with the jury's recommended sentence of imprisonment. Accordingly, we reject this contention of error.

**JAIL FEES**

In Long's final argument, he asserts that the circuit court lacked "jurisdiction" to impose jail fees. Long's Brief at 37. In particular, Long argues

---

[4] In contrast to Kentucky Revised Statutes (KRS) 421.520, KRS 532.055(2)(a)7. permits victim impact testimony to be considered by the jury during the penalty phase of a case which did not occur in this case.

that KRS 441.265(1) was amended effective July 14, 2022, and prior to the 2022 amendment, the sentencing court was endowed with authority to order jail fees. Long believes the 2022 amendment removed the statutory authority for the sentencing court to assess jail fees. Additionally, Long asserts the circuit court erroneously ordered him to pay jail fees according to the Ballard County jail schedule notwithstanding that he was incarcerated in the McCracken County jail. Long points out there was no evidence presented of McCracken County jail's fees or of any agreement between McCracken County and Ballard County as to the payment of jail fees.

Before the 2022 amendment of KRS 441.265(1), the statute provided that "[a] prisoner in a county jail shall be required by the sentencing court to reimburse the county for expenses incurred by reason of the prisoner's confinement as set out in this section, except for good cause shown." After the 2022 amendment, KRS 441.265(1)(a) reads, "[a] prisoner in a county jail shall be required beginning from the prisoner's booking date to reimburse the county for expenses incurred by reason of the prisoner's confinement as set out in this section, except for good cause shown." As pointed out by Long, the General Assembly omitted the term "sentencing court" from the 2022 amendment of KRS 441.265(1).

Although no published opinions directly address the 2022 amendment to KRS 441.265, the Kentucky Supreme Court has rendered a nonpublished

-27-

Opinion addressing the 2022 amendment in *Bowlin v. Commonwealth*, Appeal No.

2024-SC-0210-MR, 2025 WL 2999235 (Ky. Oct. 23, 2025).  We are not bound by

this Opinion, but we are persuaded by the reasoning therein as follows:

> The following year [2022], the General Assembly amended KRS 441.265(1) to remove the reference to the "sentencing court."  The statute now reads "[a] prisoner in a county jail shall be required beginning from the prisoner's booking date to reimburse the county for expenses incurred by reason of the prisoner's confinement as set out in this section, except for good cause shown."  KRS 441.265(1)(a) (emphasis added).  Bowlin argues this amendment removed the statutory authority for sentencing courts to order reimbursement of jail fees at sentencing.  This is a misreading of the statutory scheme as a whole.

> The General Assembly's amendment of the KRS 441.265 did not remove reimbursement of incarceration fees from trial courts' jurisdiction.  Although the General Assembly removed the reference to the "sentencing court" from KRS 441.265, it did not do the same for KRS 532.352 or KRS 532.358. Under KRS 532.352(1), "[t]he sentencing court may order a person who is sentenced to a term of incarceration . . . to reimburse the state or local government for the costs of his incarceration."  The statute also requires reimbursement to be paid to the jailer "in the amount specified by written order of the court."  KRS 532.352(3).  Under KRS 532.358, prisoners are required to reimburse the state or local government for the cost of incarceration "within the time and amount designated by the sentencing court[.]"

> When this Court engages in statutory interpretation, we "should not, if possible, adopt a construction that renders a provision meaningless or ineffectual or interpret a provision in a manner that brings about an absurd or unreasonable result."

> *Schoenbachler v. Minyard*, 110 S.W.3d 776, 783 (Ky. 2003) (footnotes omitted).  We presume "the legislature did not intend an absurd result" when it enacted or amended a statute. *Cosby v. Commonwealth*, 147 S.W.3d 56, 59 (Ky. 2004) (citation omitted).  Were we to interpret the removal of the reference to the sentencing court in KRS 441.265(1)(a) to entirely remove reimbursement of incarceration fees from that court's jurisdiction, KRS 532.352 and KRS 532.358 would be rendered ineffectual.  We cannot find that the General Assembly intended such an absurd result.

*Bowlin v. Commonwealth*, Appeal No. 2024-SC-0210-MR, 2025 WL 2999235, at *10 (Ky. Oct. 23, 2025).  For these reasons, we conclude that the circuit court retained authority to assess jail fees upon Long.  However, the issue concerning the amount of jail fees imposed presents a more troublesome question.

In this case, it appears that because C.H.'s father was employed at the Ballard County jail, Long was incarcerated at the McCracken County jail.  In the Judgment, the circuit court ordered Long to pay jail fees of $30 a day for 178 days, and in an order entered concomitantly with the Judgment, the circuit court mistakenly recited that Long had been incarcerated in the Ballard County jail.  Record at 142.  In conformity therewith, the circuit court concluded that under the Ballard County jail fee schedule, the daily fee was $30; consequently, the circuit court ordered Long to reimburse Ballard County at a rate of $30 per day for 178 days incarceration.  KRS 532.352(1).  The Ballard County jail fee schedule was attached to the order.  An examination of the fee schedule reveals that the inmate

-29-

housing fee was $30 as to "County," but the housing fee was $26 as to "Other County." Long maintains that he was incarcerated in an "Other County" as set forth in the fee schedule and should have been assessed, at most, $26 per day.

The circuit court was obviously proceeding under the mistaken belief that Long was incarcerated in Ballard County when he was, in fact, incarcerated in McCracken County. As it appears that the circuit court imposed a higher jail fee than permissible under the jail fee schedule, we conclude that the circuit court erred, and that this error was palpable. RCr 10.26. Therefore, we vacate the circuit court's Judgment as to imposition of jail fees. Upon remand, the circuit court shall reconsider and determine the proper amount of jail fees that may be assessed to Long based on his incarceration in McCracken County prior to sentencing.

We view any other contentions of error as moot or without merit.

## SUMMARY

Based upon the foregoing, we affirm the December 20, 2024, Judgment except as concerns the assessment of jail fees. We vacate solely as to the imposition of jail fees and remand for the circuit court to determine the proper amount of jail fees to be paid by Long based on his incarceration in McCracken County.

ALL CONCUR.

-30-

BRIEFS FOR APPELLANT:

Kayley V. Barnes
Assistant Public Advocate
Department of Public Advocacy
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Russell Coleman
Attorney General of Kentucky

James Havey
Assistant Solicitor General
Office of the Solicitor General
Frankfort, Kentucky